27 F.3d 1120
 92 Ed. Law Rep. 821
 Mark MEGENITY, Plaintiff-Appellant,
v.
Robert L. STENGER, Professor of Law, University of
Louisville School of Law; Kathleen Bean, Professor of Law,
Reinstatement and Probation Committee, University of
Louisville School of Law; Gene Teitelbaum, Professor of
Law, Reinstatement and Probation Committee, University of
Louisville School of Law; Walter Scott Thomson, Professor
of Law, Reinstatement and Probation Committee, University of
Louisville School of Law; James T.R. Jones, Associate
Professor of Law, Reinstatement and Probation Committee,
University of Louisville School of Law; Richard H. Nowka,
Professor of Law, Chair, Reinstatement and Probation
Committee, University of Louisville School of Law,
Defendants-Appellees.
 No. 93-5564.
 United States Court of Appeals,
Sixth Circuit.
 Argued April 19, 1994.
Decided June 23, 1994.
 
 Harold G. Wren (argued), Walton Johnson (briefed), Voyles & Johnson, Gary R. Hillerich, Frank E. Haddad, Jr., Louisville, KY, for Mark Megenity.
 Holland N. McTyeire (argued and briefed), Barbara Reid Hartung, Greenebaum, Doll & McDonald, Thomas H. Lyons, University Counsel, University of Louisville, Michael R. Engleman, Louisville Gas & Elec. Co., Louisville, KY, for Robert L. Stenger, Kathleen Bean, Gene Teitelbaum, Walter Scott Thomson, James T.R. Jones, Richard N. Nowka.
 Before: MILBURN and GUY, Circuit Judges; and BROWN, Senior Circuit Judge.
 GUY, Circuit Judge, delivered the opinion of the court, in which MILBURN, Circuit Judge, joined.
 BROWN, Senior Circuit Judge (p. 1125), delivered a separate opinion concurring in the result.
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 1
 Plaintiff, Mark Megenity, appeals from a summary judgment granted in favor of defendants. Megenity had administratively appealed his dismissal for academic reasons from the University of Louisville School of Law. When his appeal was denied, Megenity filed this 42 U.S.C. Sec. 1983 action claiming he had been denied substantive and procedural due process. Defendants' motion for summary judgment that followed was predicated on a theory of qualified immunity.
 
 
 2
 Defendants' summary judgment motion was referred to a magistrate judge. The magistrate judge concluded that summary judgment was appropriate, and, over the objections of both parties,[1] the district judge adopted the recommendation of the magistrate judge and entered a summary judgment in favor of defendants.
 
 
 3
 Upon review, we conclude that summary judgment was appropriate, but our analysis differs somewhat from that of the magistrate judge.
 
 I.
 
 4
 The magistrate judge made detailed findings of fact that are not disputed by either party. Accordingly, we incorporate them as our statement of the facts:
 
 FINDINGS OF FACT
 
 5
 1. Megenity was a student at the University of Louisville School of Law (the "School of Law") from the fall of 1987 until on or about January 3, 1990.
 
 
 6
 2. Defendants at all times relevant hereto were professors at the School of Law.
 
 
 7
 3. At least as early as the spring of 1989, Megenity's grades were not sufficient to enable him to remain in good standing academically. Megenity began the fall semester of 1989-90 on academic probation because his cumulative grade point average was below 2.0.
 
 
 8
 4. The Bulletin of the School of Law (the "Bulletin") states as follows with regard to an individual on academic probation:
 
 
 9
 Any student whose cumulative grade point average at the end of any semester is 1.6, in the case of a night student 1.5 (see Dismissal), but less than 2.0 shall be placed on probation for one semester. Except as is provided in Rule (1), any student on probation who does not remove all grade point deficiency in the next semester in which enrolled, shall be dismissed from the School of Law.
 
 
 10
 5. In January 1990, Megenity was dismissed from the School of Law for academic reasons because his cumulative grade point average had not been raised to at least a 2.0.
 
 
 11
 6. Megenity pursued the administrative remedies provided in the Law School's 1987-1990 Bulletin and its Student Rules, Regulations, Codes and Procedures Manual (the "Manual") with a view to obtaining reinstatement as a student in good standing in the Law School.
 
 
 12
 7. In January and February of 1990, Megenity met with Defendant Stenger on at least three occasions to discuss a grade which Megenity had received in a course taught by Stenger. Megenity contends that the "D" he received in the Domestic Relations course taught by Stenger led to his dismissal from the School of Law. Megenity contends that the exam was "fatally flawed" in that it contained an error in the drafting of one of the questions. He contends that in his third meeting with Stenger, Stenger acknowledged that the exam was flawed.
 
 
 13
 8. Megenity appealed his dismissal from the School of Law to the School of Law Reinstatement and Probation Committee (the "Committee").
 
 
 14
 9. On January 29, 1990, the Committee allowed Megenity to make an oral presentation of the reasons why he should be readmitted to the Law School, then denied his petition following a brief review of the written evidence.
 
 
 15
 10. Megenity sought an extraordinary review of his Petition by the faculty of the School of Law, but it is not clear on the record whether the faculty reviewed the merits of the petition or declined to assert its jurisdiction.
 
 
 16
 11. In the spring of 1991, Megenity filed his second petition for reinstatement with the Committee. Megenity alleges that law school personnel prevented him from preparing adequately for the second hearing by denying him access to his law school file.
 
 
 17
 12. The Committee denied Megenity's second petition for reinstatement on April 29, 1991.
 
 II.
 
 18
 The magistrate judge began his analysis by looking to see if the defendants' conduct allegedly violated a clearly established statutory or constitutional right of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The magistrate judge concluded his analysis of this issue by finding that "a student of a state university has both a substantive and procedural due process right in continuing his studies." In reaching this conclusion, the magistrate judge relied largely on our decision in Ewing v. Board of Regents of the University of Michigan, 742 F.2d 913 (6th Cir.1984). We think that this reliance was misplaced. Our decision in Ewing was reversed by the Supreme Court in Regents of the University of Michigan v. Ewing, 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985). Although the analysis used by the Court in Ewing did not necessarily reject the central holding of our decision, it was sufficiently undercut so that our decision in Ewing now becomes tenuous authority for the conclusion reached by the magistrate judge.
 
 
 19
 The difficulty of analysis in this case is contributed to by the fact that immunity jurisprudence sometimes has been less than completely clear both in the Supreme Court and in our court. Since there is a plethora of cases filed against public officials, and since immunity of one kind or another is frequently a first line of defense, there is no shortage of cases discussing immunity. As is often the case, however, more cases do not necessarily result in greater clarity.
 
 
 20
 Immunity analysis starts with a determination as to whether a defendant has absolute immunity. If a defendant has absolute immunity, then not much time need be spent looking to the nature of the wrong alleged by the plaintiff. The law has simply made a determination that public policy dictates that certain public officials will be completely protected from claims made against them growing out of the pursuit of their official duties. Because it is a departure in the law to excuse one from the consequences of wrongdoing, it is not surprising that the concept of absolute immunity is a relatively limited one and that the Supreme Court developed the separate concept of qualified immunity to apply in most cases involving alleged wrongdoing on the part of public officials.
 
 
 21
 Although the concept of qualified immunity is driven by some of the same policy considerations as absolute immunity, it also is justified in part on the basis of the recognition that the law is not always clear. We do not want public officials unduly inhibited in the performance of their duties by having to fathom what are frequently relatively murky legal concepts. Analytically, the key difference between a qualified immunity analysis and an absolute immunity analysis begins with the first step. When an official is cloaked with absolute immunity, it is not necessary to determine whether the plaintiff has a clearly established legal right because, even if he does, no relief is forthcoming.
 
 
 22
 In the qualified immunity analysis, however, we first look to see if the plaintiff has a clearly established statutory or constitutional right. If the court concludes he does not, then, theoretically at least, a public official would be entitled to qualified immunity. Viewed somewhat differently and, in our view, in a more helpful sense, however, if it is determined that the plaintiff has no clearly established right on which to base his claim, then the plaintiff has failed to state a claim upon which relief can be granted. In this instance, we are not really affording immunity to the public official when such litigation is dismissed, because one cannot be guilty of violating a right that does not exist.
 
 
 23
 However, if a court concludes after making the initial analysis that a defendant is guilty of violating a legal right possessed by the plaintiff, we then look to see whether a reasonable public official would have been aware that his conduct violates the right in question. If we conclude that a reasonable public official would not have been aware that he was committing a violation, we then afford immunity.
 
 
 24
 With this analytical framework in mind, we now turn to the analysis engaged in by the magistrate judge. The magistrate judge, as earlier indicated, first concluded that plaintiff did have a clearly established legal right. As we will elaborate further, we disagree with this conclusion because of the manner in which the Supreme Court addressed our decision in Ewing on appeal. Next, rather than looking to see if a reasonable public official would have been aware of this legal right, the magistrate judge went on to conclude that there were no disputed facts precluding him from finding that the conduct of defendants did not violate plaintiff's rights. Although we agree with this conclusion, it is actually a conclusion that supports a general summary judgment, not a summary judgment based on qualified immunity.
 
 
 25
 The Supreme Court in Ewing declined to speak definitively on the constitutional rights, if any, that a student at a university may have in his continued enrollment. The Court instead assumed the existence of a constitutionally protectable property right and found that the university's conduct did not constitute a violation of this right. Because they took this tack, the Court did not find it necessary to reject specifically the reasoning of our court in Ewing; however, footnote seven of the Court's opinion certainly does not suggest the Court's approval of the analysis we employed.[2]
 
 
 26
 Plaintiff claimed that both his procedural and substantive due process rights were violated. We think it is clear that the review procedures afforded by the law school fully satisfied whatever process was due to plaintiff. The substantive due process analysis, as always, is more complicated. In its decision in Ewing, the Supreme Court emphasized that its jurisprudence relative to substantive due process left the contours of this concept less than clear. In discussing this issue, the Court stated:
 
 
 27
 Considerations of profound importance counsel restrained judicial review of the substance of academic decisions. As JUSTICE WHITE has explained:Although the Court regularly proceeds on the assumption that the Due Process Clause has more than a procedural dimension, we must always bear in mind that the substantive content of the Clause is suggested neither by its language nor by preconstitutional history; that content is nothing more than the accumulated product of judicial interpretation of the Fifth and Fourteenth Amendments. This is ... only to underline Mr. Justice Black's constant reminder to his colleagues that the Court has no license to invalidate legislation which it thinks merely arbitrary or unreasonable.
 
 
 28
 Ewing, 474 U.S. at 225-26, 106 S.Ct. at 513 (quoting Moore v. East Cleveland, 431 U.S. 494, 543-44, 97 S.Ct. 1932, 1958, 52 L.Ed.2d 531 (1977) (WHITE, J., dissenting)).
 
 
 29
 We see no need in this case to rush in where the Supreme Court feared to tread in Ewing. The nature of plaintiff's substantive due process claim is that the action of the law school officials in reaching the conclusion that they did was arbitrary and capricious. The weakness in plaintiff's argument, however, is that he in no way sets forth why or how the action was arbitrary and capricious.
 
 
 30
 Plaintiff's claim is bottomed upon his allegation that he misread one question on a final exam, which misreading was due to what he claims to be an error in the way the question was worded. He does not indicate that any other students had a problem with the question, nor does he even indicate the precise nature of the claimed discrepancy that allegedly existed in the question.
 
 
 31
 Plaintiff was on academic probation. It takes a lot more than misreading one question on one exam to place a person in this status. The law school gave plaintiff an opportunity to redeem himself, and, in the school's opinion, he failed to do so. Included in that calculus was the school's overview of his entire academic record since entering the law school, as well as his performance for the immediately preceding semester.
 
 
 32
 Justice Powell, in his concurring opinion in Ewing, stated:
 
 
 33
 I agree fully with the Court's emphasis on the respect and deference that courts should accord academic decisions made by the appropriate university authorities.... Judicial review of academic decisions, including those with respect to the admission or dismissal of students, is rarely appropriate, particularly where orderly administrative procedures are followed--as in this case.
 
 
 34
 474 U.S. at 230, 106 S.Ct. at 516 (asterisk omitted).
 
 
 35
 We agree fully with Justice Powell's observations. Even if we were to assume that Megenity had a substantive due process right not to be expelled for an arbitrary or capricious reason, defendants here were entitled to summary judgment.
 
 
 36
 AFFIRMED.
 
 
 37
 BAILEY BROWN, Senior Judge, concurring in the result.
 
 
 38
 I have no problem in concurring in the result reached by the majority opinion.
 
 
 39
 I do, however, disagree with the implication (though not the holding) of the majority opinion that the appellant, Megenity, did not have a substantive due process right not to be dismissed from the law school for arbitrary or capricious reasons. This court, in Ewing, as is recognized by the majority opinion, clearly held that the medical student involved there had such a right. It is true, of course, that the Supreme Court reversed in Ewing, but it did so by first assuming that the medical student involved there had such a substantive due process right and then concluding that the record clearly showed that the student had not been dismissed for arbitrary or capricious reasons. It seems to me that if, in Ewing, the Supreme Court was prepared to hold that there is no such substantive due process right, logically it would have so held and would have reversed this court on that ground. I note that the Supreme Court was unanimous in supporting Justice Stevens' opinion; it may be that the Court could only be unanimous by assuming that Ewing had such a substantive due process right and then determining that such right had not been violated.
 
 
 40
 I also have a minor disagreement with another part of the analysis. It seems to me that the analysis somewhat blends the question whether a plaintiff has any right at all and the question whether, assuming that a plaintiff has such a right, the right was so clearly established at the time involved that the defendant should have been aware of the right and therefore had no qualified immunity.
 
 
 41
 I certainly concur in the remainder of the opinion and, of course, concur in the result.
 
 
 
 [1]
 Defendants objected only because the magistrate judge concluded that "a student of a state university has both a substantive and procedural due process right in continuing his studies."
 
 
 [2]
 Footnote seven of the Court's opinion reads as follows:
 Ewing and the courts below reasoned as follows: In Board of Regents v. Roth, 408 U.S. 564, 577, [92 S.Ct. 2701, 2709, 33 L.Ed.2d 548] (1972), this Court held that property interests protected by due process are "defined by existing rules or understandings that stem from an independent source such as state law." See Goss v. Lopez, 419 U.S. 565, 572-573, 95 S.Ct. 729, 735, 42 L.Ed.2d 725 (1975). In a companion case, Perry v. Sindermann, 408 U.S. 593, 601-602, [92 S.Ct. 2694, 2700, 33 L.Ed.2d 570] (1972), we held that "agreements implied from 'the promisor's words and conduct in the light of the surrounding circumstances' " could be independent sources of property interests. See Bishop v. Wood, 426 U.S. 341, 344, [96 S.Ct. 2074, 2077, 48 L.Ed.2d 684] (1976) (implied contracts). According to an antiquated race discrimination decision of the Michigan Supreme Court (whose principal holding has since been overtaken by events), "when one is admitted to a college, there is an implied understanding that he shall not be arbitrarily dismissed therefrom." Booker v. Grand Rapids Medical College, 156 Mich. 95, 99-100, 120 N.W. 589, 591 (1909). From the foregoing, Ewing would have us conclude that he had a protectable property interest in continued enrollment in the Inteflex program.
 Ewing, 474 U.S. at 222 n. 7, 106 S.Ct. at 511-12, 88 L.Ed.2d 523.