**Robert PAINTER, Plaintiff–Appellant,**

v.

**Bill ROBERTSON; Robert Tush, Defendants–Appellees.**

No. 98–3340.

United States Court of Appeals, Sixth Circuit.

Argued: March 17, 1999.

Decided and Filed: July 20, 1999.

James D. McNamara (argued and briefed), Columbus, OH, for Plaintiff–Appellant.

Charles Keith Plummer (argued and briefed), Tribbie, Scott, Plummer & Padden, Cambridge, OH, for Defendants–Appellees Bill Robertson and City of Holloway.

Douglas J. Suter (argued and briefed), Isaac, Brant, Ledman & Teetor, Columbus, OH, for Defendants–Appellees Belmont Sheriff, Robert Tush and Tim Stephen.

Before: KRUPANSKY, SILER, and BATCHELDER, Circuit Judges.

KRUPANSKY, J., delivered the opinion of the court, in which SILER, J., joined. BATCHELDER, J. (pp. 572 – 74), delivered a separate opinion dissenting in part.

## OPINION

KRUPANSKY, Circuit Judge.

The plaintiff-appellant, Robert Painter ("Painter" or "the plaintiff"), has challenged the district court's summary judgment for the defendant-appellee peace officers William Keith Robertson ("Robertson") and Robert Leonard Tush ("Tush") (collectively referenced as "the defendants"), which dismissed, upon according the officers qualified immunity, his individual capacity claims for damages under the Fourth Amendment[1] and 42 U.S.C. § 1983[2] related to his submis-

---

1. This constitutional proviso recites:

    The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
    U.S. CONST. amend. IV.

2. That enactment posits, in material part:

    Every person who, under color of any statute, ordinance, regulation, custom, or

sion, without resistance, to an involuntary body search, and his consequent arrest for carrying a concealed loaded firearm. On review, the plaintiff has contended that qualified immunity was unavailable to the defendants because clearly established federal law directed that law enforcement authorities may not frisk a citizen for weapons purportedly to ensure their individual safety when reasonable officers in the posture of the implicated agents would have known that their target was not dangerous, and lacked probable cause to arrest a person for carrying a concealed weapon if objective officers would have known that their subject carried his weapon lawfully.

Painter, a 1987 graduate of the United States Military Academy at West Point, is an honorably discharged Captain who had served five years in the United States Army as, *inter alia,* a military police commander at a major army base wherein he trained and supervised military police officers. Prior to November 1995, Painter had never been arrested, jailed, or charged with any crime. On the evening of Friday, November 18, 1995, the plaintiff worked as the sole barman at Lucky's Bar and Grill ("Lucky's") in Holloway, Belmont County, Ohio. Lucky's was owned by Painter's sister-in-law. The tavern attracted a rough and sometimes dangerous clientele, and had earned a local "punch palace" reputation. Although Painter's employment as a full-time marketing representative ("hospice consultant") for a pharmaceutical company entailed responsibility for a sales territory encompassing six West Virginia counties plus two Ohio counties, he nonetheless had agreed, commencing in July or August 1995, to assist his sister-in-law, on a part time basis, in the management and operation of Lucky's.

On the evening in controversy, a female regular patron of the pub complained sporadically to Painter that a male customer, who the plaintiff did not then recognize but was later identified as Michael E. Doan ("Doan"), was harassing her. On each occasion, Painter admonished Doan to desist from annoying the woman. Nonetheless, following intermittent post-admonition respites, Doan would promptly resume his vexation of the female. Painter suspended further alcoholic beverage sales to the intoxicated Doan, and, ultimately, at about 12 midnight, directed Doan to leave the premises because of his obstinate obstreperous and obnoxious conduct.

Approximately two hours after Doan's expulsion, Painter responded to a dissonant commotion in the tavern's back room.[3] Upon entering, he observed a fight in progress involving several individuals, including Doan, who apparently had surreptitiously re-entered the building via a side door. A companion of Doan's, later identified as Dan Shepard ("Shepard"), was a participant in the melee. In an effort to halt the violence, Painter sprayed mace at the combatants, including Doan and Shepard. Shortly thereafter, most of the party attendees departed Lucky's via the side exit. While leaving, Doan damaged the screen door. However, Shepard did not leave, but instead returned to the main area of the lounge. Painter subsequently heard Shepard, a brawny individual standing approximately 6'5" and weighing 250 pounds, loudly threaten repeatedly to kill whoever had maced him.

Painter, fearing for his safety, went outside and armed himself with a nine millimeter Smith and Wesson model 915 semiautomatic pistol which he kept in the trunk

usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law[.]

**3.** That room had been rented for a private party on the subject evening. The party sponsors had supplied a disc jockey and a beer keg.

of his automobile. The plaintiff, who at that time resided in Wallace, West Virginia, possessed a valid West Virginia permit to carry a concealed firearm.[4] Painter fully loaded the weapon, and subsequently secreted it behind the bar. He then resumed tending the bar. A short time thereafter, at about 2:00 a.m. on the morning of November 19, 1995, a visibly agitated Shepard pointed his finger menacingly at Painter as he, Shepard, advanced towards the service counter. Shepard then moved the hinged shelf which overlay the swinging gate which afforded access to the area behind the L-shaped bar, and attempted to unlatch the gate. The plaintiff responded to this aggression by aiming his handgun at Shepard, accompanied by an advisory that he "might not want to come back here." Shepard retreated, and as he left the premises, threatened that he would see the plaintiff outside. Shortly thereafter, Painter elected to close the tavern for the night.

Momentarily, as the remaining patrons were departing the bar, defendant City of Holloway Police Chief William Robertson arrived at Lucky's in response to a citizen's report of a fight at the tavern. At that time, Painter described for Robertson the earlier disturbances, including Shepard's belligerent actions, and lodged a criminal complaint against Doan for damaging the club's side screen door. The uncontradicted testimony of both Painter and Robertson evidenced that, at this juncture, the exchange between the two men

was cordial, cooperative, and friendly. Both individuals testified that they had been previously acquainted, and that Painter addressed Robertson as "Bill" and Robertson addressed Painter as "Bobby." Robertson testified that he did not feel threatened in any way by Painter during this discourse. He further attested that Painter had never threatened him, nor had he instigated any problems, during any of their prior interactions. However, although the record of testimonial evidence[5] reflected that the long-standing relationship between Painter and Robertson had generally been cordial and positive, it also revealed that Robertson had previously expressed a negative opinion of Lucky's.[6]

Following Robertson's interview of the plaintiff, the police chief returned to the tavern's parking lot, where between 15 and 30 customers, including Doan and Shepard, were milling around. Because of ongoing arguments in the parking lot, coupled with a palpable tense mood among the crowd's less than sober members, Robertson feared that further violence might erupt. Upon arresting Doan by reason of Painter's property damage complaint, Shepard or Doan, and perhaps others, advised Robertson that Painter had brandished a pistol inside the bar.[7] According to Robertson's testimony, the information supplied to him by members of the unruly belligerent mob suggested that Painter, after ordering the complete evacuation of the establishment, had indiscriminately waved his weapon around the barroom to enforce his command.[8] Nonetheless, Rob-

4. The plaintiff obtained that permit because his employment as a pharmaceutical representative marked him as a potential target of thieves who might assume that Painter transported narcotics during his hospice visits.

5. Quotations from transcripts of witness testimony reproduced in this opinion retain original ungrammatical phraseology and other deficiencies.

6. Painter testified:

And when we first came into this business, my sister-in-law and I, Mr. Robertson came and approached her and told her that if there

was ever trouble down there quote, "I will personally close this place down."

We have done our best to keep the trouble down and we've done our best to keep Mr. Robertson so he doesn't have to go on to respond to trouble.

7. Although Robertson claimed that others in the crowd had corroborated Shepard's or Doan's account of Painter's usage of his pistol, he was unable to identify any such person. Robertson took written statements against Painter only from Doan and Shepard.

8. Painter denied that he had displayed his gun to the bar's collective occupants, or that

ertson conceded that he knew that Painter had produced his firearm in an effort to forestall further rowdy conduct by Shepard or Doan.

Robertson subsequently radioed the Belmont County Sheriff Office to request backup assistance. Defendants Captain Robert Tush and Deputy Tim Stefan ("Stefan"), as well as Auxiliary Deputy Timothy Newhart ("Newhart"), responded immediately. Although Tush had not previously met Painter and knew nothing about him, he had been summoned to terminate hostilities at Lucky's on many prior occasions. Tush testified that he heard some unidentified individuals outside the lounge state that, while inside, they had been threatened with a gun by some unidentified person. However, Tush did not know the identity of any purported speaker. Tush recalled that one person, possibly a "burly man," had asserted that he had been ordered from the tavern at gunpoint. However, Tush attested without contradiction that, as a sheriff department employee who Holloway Police Chief Robertson had requested merely to supply backup in a difficult situation, he was present only to protect Robertson. Tush testified that he was not responsible for interrogating witnesses, taking statements, or performing other investigatory functions. Rather, Robertson alone exercised professional discretion in the conduct of the investigation; Tush merely followed Robertson's lead.

Newhart, who also had never known Painter, characterized Lucky's as "a known problem spot." He testified that, while in the parking lot, he overheard various former bar patrons assert that some unidentified person had displayed a weapon inside the pub following a fight and macing incident. For his part, Stefan disclosed that he had no prior knowledge of the plaintiff, and had never seen him prior to the morning in controversy, although he also had been called to Lucky's on numer-

he evicted anyone other than Shepard from

ous prior occasions to restore order among unruly customers.

For unknown reasons, the officers did not disperse the disorderly, hostile, and potentially dangerous crowd. Instead, Robertson elected to question Painter about the alleged handgun incident. The law enforcement agents lingered in the parking lot, together with the angry mob, until approximately 3:00 a.m., when the plaintiff, upon completion of his closing duties, exited and locked the inn for the night. As Painter approached his vehicle with the night's proceeds of approximately $700 and his pistol inside a belt clip holster which was concealed by his sweatshirt and camouflage jacket, Robertson, accompanied by Tush and Newhart, asked him if they could all converse inside the club. In response, the plaintiff readily unlocked the bar and permitted Robertson, Tush, and Newhart to enter. Stefan remained in the parking lot.

Once inside, Painter granted Robertson's request to permit the officers to search the tavern premises. As they searched the lounge, Robertson asked Painter several times if there was a gun on the premises. Although initially silent, Painter may have ultimately responded that the officers would not find a weapon on the premises. However, Newhart subsequently located an oak night stick and two empty mace containers behind the counter. Painter testified that Robertson then asked him to come from behind the bar, whereas Robertson testified that Painter unilaterally commenced movement behind the bar. Robertson asserted that he felt threatened by Painter's conduct at that point, although he failed to articulate a coherent reason for that alleged fear. Robertson testified:

> Well, at that point in time, I did not know because of the front door being right there whether he was going—I didn't know what was happening that night. I mean, there was a lot of emotion going on. Mr. Painter was upset

the premises at gunpoint.

because of the fights that took place in the bar, the property that was destroyed. I did not know what he was going to do once he come out from behind that bar.

Captain Tush, who like Newhart and Stefan, was not acquainted with Painter and had not participated in Robertson's earlier conversation with him, also testified that Painter's movements behind the bar caused him some discomfort. However, he conceded that the plaintiff had made no direct threats, did not use any provocative language, had committed no crime in the officers' presence, and had otherwise behaved normally. Tush related at deposition that he was apprehensive about Painter's conduct for the following reasons:

No, I'm only concerned at this point probably with the movement of Mr. Painter. Again, I'm looking for weapons and all of a sudden I've got a man that's been standing by the back door, now all of a sudden he's moving, I'm wondering what's going on.

. . . .

First of all, I am there at a bar that has reportedly a fight there with weapons, that there was a gun being used by somebody. The original search started with Mr. Painter at the door talking, and as we rounded the corner of the bar, that's when Mr. Painter started moving and he became nervous and his actions at that time did not warrant a man that was not guilty of anything to do such an act. I've got three officers here. I've got another officer outside. I've got myself, plus I have a reserve deputy there plus Chief Robertson, I have to be concerned as a captain with the safety of everybody there. So, yes, I became extremely concerned because of his I consider it unwarranted actions and his nervousness to be extremely concerned, especially when I find weapons that are already there when he said there was no weapons then all of a sudden we find weapons [two mace cans and an oak night stick]. . . .

. . . .

Because Mr. Painter at that point is now acting extremely irrational. . . . When you combine it with the fact that there was weapons that was already found, that he said that there was not going to be any weapons, you won't find nothing there, he's left his position of being relaxed talking to the chief at the front door and now he's headed down the left side of the bar and a man that has absolutely nothing to worry about should never have left the front door to begin with, he should have still been standing there talking which wouldn't arouse my suspicion what is going on, why is this man leaving, why is this man now traveling.

Auxiliary Deputy Newhart testified that Robertson had asked Painter several times for permission to search his person, but Painter did not respond. Newhart asserted at deposition that he considered Painter's behavior suspicious and a cause for safety concerns. However, Newhart conceded that Painter had made no threatening statements, did not use offensive language, did not assault any officer, committed no crime in the officers' presence, and had caused no trouble "[o]ther than him being cocky and evasive."

Following the surfacing of the night stick and the mace canisters, Painter refused Robertson's request for consent to perform a body search. He further revoked his consent for the premises search and directed the officers to depart. At that juncture, Tush drew his service revolver and held it at the "low ready" position. Either Tush or Robertson ordered Painter to place his hands upon the bar.

Under compulsion, Painter responded submissively and assumed the search position against the bar. The plaintiff volunteered that he had a pistol in a holster clipped onto his trousers' waistband moments after Robertson commenced a patdown search. Robertson seized that firearm, handcuffed Painter, and arrested him

for carrying a concealed weapon. Robertson and Tush escorted Painter to Robertson's squad cruiser. Robertson transported Painter to the Belmont County Jail, where he was detained for approximately seven hours until a relative posted his bail.

On November 22, 1995, Robertson initiated a criminal complaint in Belmont County Common Pleas Court which charged Painter with the carriage of a concealed deadly weapon. *See* OHIO REV. CODE § 2923.12(A) ("No person shall knowingly carry or have, concealed on his person or concealed ready at hand, any deadly weapon or dangerous ordnance.")[9] Following a December 7, 1995 preliminary hearing, the state court ruled that probable cause existed to believe that Painter had violated section 2923.12(A), and bound the case over to the Belmont County grand jury. On January 4, 1996, the grand jury returned a one count indictment charging Painter with knowingly carrying a deadly weapon on his person in offense to OHIO REV.CODE § 2923.12(A).

On July 1, 1996, a second Belmont County common pleas judge presided over an evidentiary hearing on Painter's motion to suppress the evidence which had been seized on November 19, 1995 as the fruit of an illegal search, and to dismiss the indictment. Only Painter and Robertson testified during that proceeding. On July 9, 1996, the common pleas judge resolved that "[t]here was no evidence presented to this court that the law enforcement officers felt that their safety was at risk nor was there any testimony that [Painter] made any indication either verbally or by physical actions that would lead the officers to believe they were at risk." The Ohio court's judgment pronounced that "the search of [Painter] was unreasonable and further that he had an affirmative defense for the carrying of a concealed weapon."[10] The state trial court ordered the suppression of Painter's handgun and the dismissal of the criminal prosecution. On July 13, 1996, the Holloway Police Department returned to Painter all property it had seized from him on November 19, 1995, namely the Smith and Wesson firearm, fourteen rounds of ammunition, the pistol's ammunition clip, the clip-on holster, the oak nightstick, and two empty mace canisters.

On November 14, 1996, Painter initiated a damages complaint in Ohio court against Robertson, the Village of Holloway, the Belmont County Sheriff, and John Doe sheriff department personnel, by which he asserted constitutional tort claims under 42 U.S.C. § 1983. The section 1983 claims against the law enforcement operatives were asserted in both their individual and official capacities. On December 13, 1996, the Belmont County Sheriff removed the action to federal district court. Following initial discovery, Painter on April 30, 1997 lodged his amended complaint which incorporated Tush and Stefan (misspelled "Stephen") as named defendants,[11] and which

---

**9.** Unless otherwise indicated, all citations herein are to OHIO REV.CODE ANN. § 2923.12 (Anderson 1996) reference Title 29, Volume One ("For Offenses Committed PRIOR TO July 1, 1996"). However, the current portions of section 2923.12 which are germane to the case in controversy are substantially identical. *See* OHIO REV.CODE ANN. § 2923.12 (Anderson 1996 & Supp.1998), Title 29, Volume Two ("For Offenses Committed ON OR AFTER July 1, 1996").

**10.** The common pleas court referenced OHIO REV.CODE § 2923.12(C), which affirmatively justified or excused Painter's possession of the concealed handgun:

> It is an affirmative defense to a charge under this section of carrying or having control of a weapon other than dangerous ordnance, that the actor was not otherwise prohibited by law from having the weapon, and that any of the following apply:
>
> . . . .
>
> (2) The weapon was carried or kept ready at hand by the actor for defensive purposes, while he was engaged in a lawful activity, and had reasonable cause to fear a criminal attack upon himself or a member of his family, or upon his home, such as would justify a prudent man in going armed.

**11.** The record did not reveal why the plaintiff declined to name Newhart as a party defendant.

joined Ohio law tort causes of action. On January 5, 1998, Painter voluntarily dismissed, with prejudice, defendants Stefan and the Belmont County Sheriff.

Subsequently, the remaining defendants (Robertson, Tush, and the Village of Holloway) each moved for summary judgment on the plaintiff's federal civil rights claims, whereas Painter inaugurated a cross motion for summary judgment on all claims against all defendants. On February 13, 1998, the district court denied the plaintiff's motion in its entirety, but granted summary judgment on the federal claims in favor of each individual defendant in his personal capacity on a qualified immunity rationale;[12] and for the Village of Holloway and Robertson in his official capacity[13] because even if Robertson had committed a constitutional tort, no evidence proved that any official policy or custom of the Village of Holloway had motivated his wrongful conduct, and thus official liability was barred. *E.g., City of Canton v. Harris,* 489 U.S. 378, 387–89, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The trial court also perfunctorily dismissed the plaintiff's section 1983 official capacity claim against Tush. On March 3, 1998, the plaintiff voluntarily dismissed, without prejudice, his pendent state law claims. On review, Painter has contested only the district court's summary dismissal, by reason of qualified immunity, of his section 1983 individual capacity damages claims against Robertson and Tush for alleged illegal search and arrest.

■ A court may grant summary judgment under FED.R.CIV.P. 56 only if, after construing the record evidence, and reasonable inferences which may be drawn therefrom, most favorably for the party opposing the motion, the proof could not support a judgment in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, a lower court's summary judgment award is reviewed *de novo,* because the legal sufficiency of the record evidence which supports the nonmoving party's case poses a question of law. *See Doe v. Claiborne County,* 103 F.3d 495, 505 (6th Cir.1996). The key inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1310 (6th Cir.1989) (*quoting Anderson v. Liberty Lobby,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Accordingly, the issue presented to this reviewing forum is whether the summary judgment record, *when construed most favorably for the plaintiff,* conclusively supports a qualified immunity defense for Robertson and Tush as a matter of law.[14]

■ "Qualified or 'good faith' immunity is an affirmative defense that is available to government officials performing discretionary functions." *Rich v. City of Mayfield Hts.,* 955 F.2d 1092, 1094 (6th Cir. 1992). By operation of that doctrine, those officers

---

**12.** Qualified immunity, discussed further below, may foreclose only individual capacity lawsuits for damages against public agents. *See Harlow v. Fitzgerald,* 457 U.S. 800, 808, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Bass v. Robinson,* 167 F.3d 1041, 1051 (6th Cir. 1999).

**13.** An official capacity damages action against a state officer is the equivalent of a damages liability litigation targeted against the public entity. *Will v. Michigan Department of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

**14.** Because the lower court's *denial* of Painter's cross-motion for summary judgment on the merits against the defendants is not presently before this reviewing forum, it has occasion only to address the sufficiency of the evidence in support of the trial court's *grant* of summary judgment to the defendants. This court expresses no view as to whether the current record could support summary judgment on the merits for the plaintiff on any issue.

generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established [federal] statutory or constitutional rights of which a reasonable person would have known.

*Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

■ Accordingly, any "objectively reasonable" action by a state officer, as assessed in the light of clearly established law at the time of the conduct at issue, will be insulated by qualified immunity. *Id.* Thus, even if a public officer has deprived the plaintiff of a federal right, qualified immunity will apply if an objective reasonable official would not have understood, by referencing clearly established law, that his conduct was unlawful. *See County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 1714 n. 5, 140 L.Ed.2d 1043 (1998); *Rich,* 955 F.2d at 1095. The question whether an asserted federal right was clearly established at a particular time presents an issue of law subject to plenary review. *Elder v. Holloway,* 510 U.S. 510, 516, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994). "In inquiring whether a constitutional right is clearly established, we must 'look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits.'" *Walton v. City of Southfield,* 995 F.2d 1331, 1336 (6th Cir.1993) (citation omitted).

■ "The ultimate burden of proof is on the plaintiff to show that the defendants are not entitled to qualified immunity." *Rich,* 955 F.2d at 1095. Claims of qualified immunity are assessed on a fact-specific basis to ascertain whether the particular conduct of the defendant state employee infringed a clearly established federal right of the plaintiff, and whether an objective reasonable officer would have believed that his conduct was lawful under

extant federal law.[15] *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Although the application of qualified immunity comprises a legal issue, summary judgment is inappropriate when conflicting evidence creates subordinate predicate factual questions which must be resolved by a fact finder at trial. *See Johnson v. Jones,* 515 U.S. 304, 313–15, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995).

■ Although a premises search conducted pursuant to valid consent cannot violate the Fourth Amendment, *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the consenting party may limit the scope of that search, and hence at any moment may retract his consent. *See Florida v. Jimeno,* 500 U.S. 248, 251–52, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991); *United States v. Gant,* 112 F.3d 239, 242 (6th Cir.1997); *United States v. Mitchell,* 82 F.3d 146, 151 (7th Cir.1996). Thus, although the instant defendant officers had legitimately entered Lucky's pursuant to Painter's permission, and were conducting a legal consent search thereof, that search should have terminated instantly upon Painter's revocation of consent, and the officers should have promptly departed the premises (assuming they possessed no independent legal authority to remain). Instead, Tush drew his sidearm upon the plaintiff; and Robertson frisked and arrested him.

■ However, Robertson has argued that the officers justifiably performed an investigative pat-down search of Painter instead of departing immediately because they possessed a reasonable suspicion, supported by articulable facts, that the plaintiff was both armed *and* potentially dangerous. *Terry v. Ohio,* 392 U.S. 1, 27–30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Sibron v. New York,* 392 U.S. 40, 63–65, 88

---

**15.** The *Anderson* Court remarked that an officer's *subjective* beliefs about the legality of his conduct are irrelevant to this inquiry. *Anderson,* 483 U.S. at 641, 107 S.Ct. 3034.

*Accord, Crawford–El v. Britton,* 523 U.S. 574, 118 S.Ct. 1584, 1592, 140 L.Ed.2d 759 (1998).

S.Ct. 1889, 20 L.Ed.2d 917 (1968); *Adams v. Williams,* 407 U.S. 143, 145–46, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). *See, e.g., United States v. McNeal,* 955 F.2d 1067, 1076–78 (6th Cir.1992) (explaining that after a patrolman is lawfully inside a structure, either by authority of a warrant or consent, a pat-down search of a person within that building is governed by *Terry* and its progeny). The historical facts and circumstances pertinent to the "reasonable suspicion" inquiry pose pure factual issues, whereas the ultimate "reasonable suspicion" query constitutes a mixed issue of law and fact. *See Ornelas v. United States,* 517 U.S. 690, 696–98, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *Houston v. Clark County Sheriff Deputy John Does 1–5,* 174 F.3d 809, 813 (6th Cir.1999).

■ Construing the summary judgment record and its reasonable inferences most favorably for the plaintiff, defendant Robertson beyond controversy lacked a reasonable suspicion to justify frisking Painter. Chief Robertson knew that Painter had been forced to expel aggressive, intoxicated, and minatory patrons from the lounge, and had been the target of serious threats, a violent assault, and an attempted battery, earlier that same evening. Robertson had spoken with Painter shortly after those incidents and found him to be calm, cooperative, and non-menacing. Moreover, he knew that Painter was a law-abiding model citizen who had never caused any trouble, and that he was aiding his sister-in-law in the management and operation of her business.[16] Accordingly, he knew prior to searching Painter that, if he indeed had concealed a loaded firearm on his person or within ready access inside the bar, he had a legal justification for that possession,[17] and no articulable facts supported a suspicion that the plaintiff posed a potential safety hazard to any law-abiding person.

Nevertheless, Robertson elected to treat the crime victim as a criminal offender, on the apparent strength of vague accusations made by unidentified intoxicated persons in the club's parking lot that Painter had brandished a firearm around the barroom. None of the officers was able to identify any person who had made this accusation against Painter other

16. Indeed, Captain Tush testified that he would not have feared for his safety if he had known about the earlier disturbances at Lucky's and the plaintiff's defensive reason for carrying his handgun:

> Mr. Painter could have avoided all of this if he would have just said right up front when we come in the bar that he had a weapon on, it would have been all done and over with.
>
> . . . .
>
> First of all, you know, as a businessman myself not only as a law enforcement officer but as a businessman, as a businessman you've got a right to a defense if you're handling money of any sort, so coming right off the bat saying, you know, knowing that you're a bartender and that you've got a tough bar there to begin with, if you'd have just said I do have a weapon on, fellows, I had problems here tonight, here's the gun, it's inside my pants belt, it would have been all done and over with.
>
> . . . .
>
> ... [A]s a businessman, he would have had a right to that weapon. Lying and then acting very evasive and then showing what

> I consider an advance toward the other officers when we're doing a search is showing me that he's trying to cover something up or he's up to something. And then all of a sudden when you recall back at the very beginning you're not going to find nothing and you do find weapons, now you're saying he said you're not going to find anything, we've already found two weapons, the guy outside is saying he was threatened with a gun, where in the hell is the gun at, if there was other weapons, there's got to be a gun now.

The record did not reveal the nature of Tush's business interests or activities.

17. A *Terry* pat-down search may be justified by an officer's reasonable suspicion that the subject is armed and potentially dangerous, even if the target's carriage of a concealed weapon would not be illegal *per se,* because the purpose of the investigative frisk is to disarm a threatening subject rather than to gather evidence of crime. *Adams,* 407 U.S. at 146, 92 S.Ct. 1921. Nonetheless, the legality of the target's suspected possession of a weapon obviously remains relevant to the "potential danger" inquiry.

than Doan and/or Shepard. Robertson knew that Doan and/or Shepard had incited disturbances at the bar, damaged property, and threatened Painter, which compelled Painter to order them from the tavern and to file a criminal complaint against Doan; accordingly Robertson knew that Doan and Shepard were of highly questionable veracity and possessed personal animosity against Painter, and thus that their accusations lacked sufficient indicia of reliability to warrant an objective reasonable suspicion that the plaintiff might be dangerous. *See Adams,* 407 U.S. at 146–47, 92 S.Ct. 1921 (1972).

Painter testified that his nervousness, evasiveness, and disposition towards the officers during their consent search of the inn was a byproduct of Robertson's questions, demeanor, and attitude, which betrayed an intention to charge Painter with a crime.[18] This concern may have been well conceived in light of testimony, quoted in note 6 above, that Robertson had previously stated that he considered Lucky's to pose a public nuisance and a chronic policing headache, which may have prompted him to exaggerate a compelling justification for the tavern's permanent closure. In any event, Robertson's unfounded accusatory behavior towards Painter created the tense and confrontational environment during the consent search. By contrast, prior to being treated as a criminal by Robertson, Painter had done nothing to suggest that he had committed any crime that night, or that he might pose any danger to the officers or to any civilian who had not threatened his safety. Thus, on the summary judgment record construed most favorably for the plaintiff, Robertson lacked any reasonable suspicion which could be supported by articulable facts that Painter might aggressively men-

ace any person; hence the faulted body search was unconstitutional. Moreover, as a matter of law, qualified immunity could not excuse Robertson from potential liability for that body search, at least on summary judgment, because clearly established law, including *Terry, Sibron,* and *Adams,* dictated prior to November 19, 1995 that a *Terry* frisk must be supported by an objectively reasonable suspicion that the subject was potentially dangerous.

■■■■■ Because this review concludes only that the record evidence, *when construed most favorably for the plaintiff,* proves that Robertson violated Painter's Fourth Amendment right against unreasonable search and is not safeguarded by qualified immunity from liability for that act, it must now address the question whether, assuming *arguendo* a *valid* body search and seizure of Painter's pistol, Robertson had probable cause to *arrest* Painter for the Ohio crime of carrying a concealed dangerous weapon and, if not, whether he was protected by qualified immunity from liability for that offense. A section 1983 wrongful arrest claimant must prove that the arresting officers lacked probable cause to believe that the suspect had committed the charged crime. *Stemler v. City of Florence,* 126 F.3d 856, 871 (6th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1796, 140 L.Ed.2d 936 (1998). "Probable cause" denotes "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Criss v. City of Kent,* 867 F.2d 259, 262 (6th Cir. 1988) (*quoting Michigan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979)). "If the circumstances, viewed

---

**18.** Painter testified:

Bill came to the corner of the bar and he said, "Hey, is there a gun in here?"

And the way he said that, I was feeling like he was trying to get something on me, like I had done something wrong, after everything I had been through. I never said a word....

. . . .

Because when I was approached by Mr. Robertson, I felt that for some reason in his demeanor and the way he approached me that he was trying to get me for something.

objectively, support a finding of probable cause, the arresting officer's actual motives are irrelevant." *Criss*, 867 F.2d at 262. In section 1983 cases, the existence of probable cause usually poses a jury question. *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir.1995); *Yancey v. Carroll County*, 876 F.2d 1238, 1243 (6th Cir.1989). Whereas the implicated circumstances comprise factual issues, the ultimate probable cause determination is a mixed issue of law and fact. *Ornelas v. United States*, 517 U.S. 690, 696–98, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

Robertson has argued that, upon surfacing the firearm, his probable cause to arrest Painter was manifest, because Painter had clearly committed each statutory element of the offense in controversy, namely the knowing concealment of a deadly weapon on the subject's person. OHIO REV.CODE § 2923.12(A). In response to Painter's contention that Robertson knew that he carried his gun in accordance with the affirmative defense created by OHIO REV.CODE § 2923.12(C)(2) (that the possessor carried his dangerous weapon "for defensive purposes, while he was engaged in a lawful activity, and had reasonable cause to fear a criminal attack upon himself ... such as would justify a prudent man in going armed"), Robertson has urged that, on November 19, 1995, no clearly established law restricted a peace officer's authority to arrest any person whom a reasonable officer would believe had committed each of the predicate requisites of a criminal offense, simply because that suspect might have a legal justification or excuse for that conduct. Thus, Robertson has asserted that any information which he possessed concerning the night's prior events, or of Painter's character and background, were

irrelevant to the fact that Painter had affronted the literal strictures of section 2923.12(A) at the time of his arrest, independent of any proffered affirmative defense.

However, on February 12, 1999, this circuit resolved that, in 1991, clearly established federal law directed that the probable cause inquiry must encompass *all* "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense," *including* facts and circumstances establishing a statutorily legitimated affirmative justification for the suspected criminal act. *Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1013–14 (6th Cir.1999) (*quoting Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979)). In *Estate of Dietrich*, the Sixth Circuit affirmed a district court's denial of qualified immunity to Ohio policemen who had arrested two professional cash couriers upon their admission that they were carrying concealed weapons, because those officers knew that those men legally carried their weapons by operation of OHIO REV.CODE § 2923.12(C)(1),[19] and thus they lacked probable cause to believe that the plaintiffs had transgressed any law. *Id.* at 1011.

The *Estate of Dietrich* court, in rejecting the defendants' argument that, in 1991, no controlling federal authority had clearly dictated that, in evaluating probable cause, an arresting officer must assess the potential validity of a criminal suspect's claim of statutory justification or excuse, ruled that federal constitutional law had clearly provided at least since the Supreme Court's

---

19. The court in *Estate of Dietrich* quoted the current version of section 2923.13(C)(1), which permits a concealed weapon to be:

carried or kept ready at hand by the actor for defensive purposes, while the actor was engaged in or was going to or from the actor's lawful business or occupation,

which business or occupation was of such a character or was necessarily carried on in such manner or at such time or place as to render the actor particularly susceptible to criminal attack, such as would justify a prudent person in going armed.

OHIO REV.CODE § 2923.12(C)(1).

decision in *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), "that probable cause determinations involve an examination of all facts and circumstances *within an officer's knowledge at the time of an arrest.*" *Estate of Dietrich*, 167 F.3d at 1012 (emphasis in original). *See also Adams v. Williams*, 407 U.S. 143, 148–49, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (positing that an arrest for carrying a concealed weapon following the arresting officer's removal of a loaded revolver from the suspect's waistband was supported by probable cause because the surrounding circumstances "suggested *no* lawful explanation for possession of the gun.") (Emphasis added).

■ The *Estate of Dietrich* precedent comprises binding *stare decisis* in the case at bench.[20] Thus, beyond controversy, clearly established federal law had stipulated since 1925, and thus prior to November 18–19, 1995, that a peace officer, in assessing probable cause to effect an arrest, may not ignore information known to him which proves that the suspect is protected by an affirmative legal justification for his suspected criminal actions.[21] In the instant case, upon construction of the record most favorably for the plaintiff, a reasonable officer in Robertson's position would have known that Painter legally carried his concealed handgun as authorized by OHIO REV.CODE § 2923.12(C)(2). Accordingly, the district court improperly awarded summary judgment to Robertson on the basis of qualified immunity.

■ On the other hand, the overall posture of defendant Tush was materially distinct from that of Robertson. After construing the record evidence and the supportable inferences to be derived therefrom most favorably for the plaintiff, it is nonetheless clear that no record evidence proved that Tush knew, or objectively could be expected to have known, that the plaintiff was not potentially dangerous, or

**20.** *See, e.g., Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 115 S.Ct. 1745, 131 L.Ed.2d 820 (1995), whereby the Court explained that a decision issued by a controlling court which decrees a civil law ruling must, in most instances, be applied retroactively in pending litigations, including those which involve events predating the new judicial edict. *Id.* at 752, 115 S.Ct. 1745. Although the Court recognized that subsequent judicial mandates typically will not control qualified immunity cases because such causes are adjudicated with reference to law which was "clearly established" at the time of the defendant's faulted conduct, *see id.* at 759, 115 S.Ct. 1745, the ruling of *Estate of Dietrich* nonetheless must be applied to the case at bench in accordance with the general retroactivity rule, because *Estate of Dietrich* did not create a novel standard but instead merely identified the pertinent clearly established law as it had existed since 1925.

A rule of law may be "clearly established" even if no pre-existing judicial precedent had precisely addressed the implicated issue:
> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ... but it is to say

that in the light of pre-existing law the unlawfulness must be apparent.
*Bass*, 167 F.3d at 1051 (*quoting Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

**21.** In so ruling, this forum emphasizes that it does not mandate that law enforcement operatives should conduct quasi-trials as a necessary predicate to the warrantless arrest of perpetrators in every situation wherein the subject asserts a purported legal excuse for his actions. Rather, this court, like the *Estate of Dietrich* panel, merely resolves that, where a reasonable police officer would conclusively know that an investigative target's behavior is protected by a legally cognizable affirmative defense, that officer lacks a legal foundation to arrest that person for that behavior. *See Estate of Dietrich*, 167 F.3d at 1011 (observing that "all the defendants in this matter knew, prior to arresting the Dietrichs, that the plaintiffs were legitimately armed for the purpose of conducting a business that was particularly susceptible to criminal attack.") In all other cases, the merits of an alleged affirmative defense should be assessed by prosecutors and judges, not policemen. *See Linn v. Garcia*, 531 F.2d 855, 861 (8th Cir.1976) (remarking that police officers cannot be required to conduct a trial-like inquiry as a precondition to executing a valid arrest).

that his concealment of a dangerous weapon on his person was legally authorized. The record disclosed that Captain Tush had not been acquainted with Painter and knew nothing about him prior to November 19, 1995; had not been privy to Painter's earlier conversation with Robertson wherein he had described the earlier disturbances caused by Doan and Shepard, lodged a complaint for criminal property damage against Doan, and exhibited a peaceful and cooperative demeanor; had not been aware that Shepard had threatened Painter's life and had attempted to physically attack him; and, as a sheriff department employee who had been hailed to the scene by a municipal police chief merely to provide back-up assistance and protection, was not responsible for investigating suspected crimes but merely followed the municipal authority's lead.

All that Tush knew, or reasonably could have been expected to know, during the consent search of Lucky's was that some person or persons had claimed that during an earlier altercation inside the bar an unidentified person had brandished a firearm; at least some members of the crowd in the parking lot were apparently agitated; Robertson suspected that the bartender was the individual who had used the weapon and that he could have been carrying a concealed weapon; and that the plaintiff, at least in Tush's opinion, was behaving evasively, nervously, and suspiciously during the premises search. Thus, to the extent that Tush assisted Robertson's search and arrest of Painter, he is protected by qualified immunity even if Robertson's actions violated the Fourth Amendment. A reasonable officer in Tush's position would have been objectively justified in the belief that Robertson's

frisk and arrest of Painter comported with existing legal strictures because, based on the limited incomplete information available to Tush, a reasonable suspicion existed that the plaintiff may have been carrying a concealed deadly weapon and was potentially dangerous;[22] probable cause existed, after Robertson seized the concealed firearm, to believe that he had breached section 2923.12(A); and no apparent affirmative justification existed for that infraction.

Accordingly, the lower court's entry of summary judgment for defendant Robert Tush is **AFFIRMED,** whereas the summary judgment for defendant William Robertson is **REVERSED.** The case is **REMANDED** for further proceedings consonant with this decision.

BATCHELDER, dissenting in part.

For the reasons that follow, I respectfully dissent from the majority's holding that Defendant Robertson is not entitled to summary judgment on grounds of qualified immunity on Painter's claim of false arrest. Relying on *Estate of Dietrich v. Burrows,* 167 F.3d 1007 (6th Cir.1999), the majority holds—wrongly, in my view—that Painter's affirmative defense under § 2923.12(C)(2) vitiated the officers' probable cause to arrest him for carrying a concealed weapon. Painter was arrested for carrying a concealed weapon in violation of Ohio Rev.Code § 2923.12 but at trial was able to avail himself of one of the affirmative defenses found in subsection (C). The affirmative defense provision states:

> (C) It is an affirmative defense to a charge under this section of carrying or having control of a weapon other than dangerous ordnance, that *the actor was*

---

**22.** *See Megenity v. Stenger,* 27 F.3d 1120, 1124 (6th Cir.1994) ("If we conclude that a reasonable public official would not have been aware that he was committing a [constitutional] violation, we then afford immunity.").

The Supreme Court has recently reaffirmed that a well-founded concern for officer safety creates "both [a] legitimate and weighty" ra-

tionale for conducting a warrantless nonconsensual search. *Knowles v. Iowa,* 525 U.S. 113, 119 S.Ct. 484, 487, 142 L.Ed.2d 492 (1998) (*quoting Maryland v. Wilson,* 519 U.S. 408, 412, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997); *Pennsylvania v. Mimms,* 434 U.S. 106, 110, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977)).

*not otherwise prohibited by law from having the weapon,* and that any of the following apply:

. . . .

(2) The weapon was carried or kept ready at hand by the actor for defensive purposes, while the actor was engaged in a lawful activity and had reasonable cause to fear a criminal attack upon himself or a member of his family, or upon his home, such as would justify a prudent man in going armed.

Ohio Rev.Code § 2923.12 (emphasis added). The language of the statute makes it clear that an affirmative defense to carrying a concealed weapon has two distinct parts, both of which must be present: (1) the actor must be "not otherwise prohibited by law from having the weapon," *and* (2) at least one of the four enumerated justifications must apply to the actor's concealed carrying of the weapon.

In *Estate of Dietrich,* the plaintiffs were a former township police chief and his son, who began performing armed money courier services which current township police officers had been performing, both on and off duty. Because of inquiries instigated by the plaintiffs, the township police department stopped providing the courier service. The defendants were members of the township police department; indeed one was the chief who ordered that the police department vehicles could no longer be used to provide courier service. *Id.* at 1009. One afternoon, when the defendants knew that the plaintiffs would be armed and performing their legitimate security duties, they maliciously arrested the plaintiffs and charged each of them with carrying a concealed weapon in violation of Ohio Rev.Code § 2923.12. *Id.* at 1009–10.

The district court in *Estate of Dietrich* found that the record proved conclusively that prior to the arrest, the arresting officers "knew who the plaintiffs were and also were fully aware that the plaintiffs were carrying firearms . . . ." *Id.* at 1012. This Court affirmed the district court's denial of qualified immunity, stating that

"all the defendants in this matter knew, prior to arresting the Dietrichs, that the plaintiffs were legitimately armed . . . [and] that the plaintiffs were justified—by statute—in carrying concealed weapons during their work." *Id.* at 1011–12. We held that the arresting officers were not entitled to qualified immunity on the plaintiffs' unlawful arrest claim because the affirmative defense provisions of § 2923.12(C) made clear that they lacked probable cause to effect an arrest. *Id.* at 1012. In so holding, the Court stated that "probable cause determinations involve an examination of all facts and circumstances *within an officer's knowledge at the time of an arrest.*" *Id.* (citing *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925)) (emphasis in original).

The case before us here does not present the kind of unique factual circumstances found in *Estate of Dietrich,* where it was uncontroverted that the arresting officers knew, prior to arrest, that the actors were carrying concealed weapons, knew by virtue of the plaintiffs' backgrounds that they were "not otherwise prohibited by law from having the weapon[s,]" and knew that their carrying of concealed weapons was justified under the statute. Here, except for Defendant Robertson, the officers did not know Painter at all; none of the officers knew that he was armed—indeed, the point of the search was to determine whether he had a gun; they certainly did not know, nor could they reasonably have known, that Painter was "not otherwise prohibited from carrying a concealed weapon" under the statute.

The majority states that Robertson "knew that Painter was a law-abiding model citizen who had never caused any trouble," but there simply is no evidence in the record to support this statement. The sum total of the evidence pertaining to Robertson's knowledge of Painter is (1) Painter's affidavit statement that he and Robertson "had known each other for a long time before the night in question" and that on that night, Robertson had called

him "Bobby;" (2) Painter's testimony from the state court suppression hearing that Robertson had told Painter's sister-in-law when she and Painter had first begun to operate the bar that if there was any trouble there, he would close the place down; (3) Robertson's testimony from that suppression hearing that the incident in question was the "first trouble" he had ever had with Painter; and (4) Robertson's acknowledgment that on the night in question, Painter had cooperated with him during their initial encounter but lied about being armed and about having weapons on the premises. There is no evidence in the record that Robertson had any knowledge whatsoever of Painter's life outside of his activities as a bartender at Lucky's Bar and Grill in Belmont County, Ohio; indeed it is undisputed that Painter not only was not a resident of Belmont County, he was not even a resident of Ohio. Certainly there is no evidence that Robertson knew that Painter was, as the majority describes him,

> a 1987 graduate of the United States Military Academy at West Point, ... an honorably discharged Captain who had served five years in the United States Army as ... a military police commander at a major army base wherein he trained and supervised military police officers [, and a man who] had never been arrested, jailed, or charged with any crime.

Unlike the record in Estate of Dietrich, the record in this case does not conclusively establish that any of the arresting officers knew that the plaintiff was not otherwise prohibited from having a weapon, and that one of the four statutory justifications applied to his concealed possession of it.

The majority opinion establishes that for the purposes of qualified immunity in this circuit, "an examination of all facts and circumstances *within an officer's knowledge at the time of arrest*" on a charge of carrying a concealed weapon is no longer enough. *Estate of Dietrich,* 167 F.3d at 1012 (citing *Carroll,* 267 U.S. at 162, 45

S.Ct. 280). Rather, an officer now must unilaterally determine whether the suspect is both justified under the statute and not otherwise prohibited from carrying a concealed weapon before that officer may effect an arrest. This is an obvious departure from our precedent and certainly was not clearly established in this Court or any court at the time of Painter's arrest. For the foregoing reasons, I dissent.