364 F.3d 205
 Richard W. GOLDSTEIN, Plaintiff-Appellant,
v.
Harry I. MOATZ, Director, Office of Enrollment and Discipline; Lawrence Anderson; James E. Rogan, Under Secretary of Commerce for Intellectual Property and Director of the USPTO; James A. Toupin; David M. Purol, USPTO, Patent Examiner; John Does 1-5; United States of America, Defendants-Appellees.
 No. 03-1257.
 United States Court of Appeals, Fourth Circuit.
 Argued: October 29, 2003.
 Decided: April 14, 2004.
 
 COPYRIGHT MATERIAL OMITTED ARGUED: Adam Augustine Carter, Washington, D.C., for Appellant. Richard Parker, Assistant United States Attorney, Alexandria, Virginia, for Appellees. ON BRIEF: Paul J. McNulty, United States Attorney, Alexandria, Virginia, for Appellees.
 Before WILLIAMS, MOTZ, and KING, Circuit Judges.
 Affirmed in part, vacated in part, and remanded by published opinion. Judge KING wrote the opinion, in which Judge WILLIAMS joined. Judge DIANA GRIBBON MOTZ wrote a dissenting opinion.
 OPINION
 KING, Circuit Judge:
 
 
 1
 Richard W. Goldstein, a patent lawyer, appeals an award of absolute immunity accorded certain officials of the Patent and Trademark Office for their conduct in an attorney disciplinary investigation. Goldstein also appeals the denial of his challenge to a certification on the scope of defendant David Purol's employment and the denial of discovery on the certification. Because defendants Harry Moatz, Lawrence Anderson, and James Toupin are not absolutely immune from Goldstein's Bivens claim for damages,[1] and because the district court did not separately consider whether the defendants are immune from suit for declaratory relief, we vacate and remand on those aspects of this appeal. We affirm the court's dismissal of defendant James Rogan and its ruling on the scope of employment certification.
 
 I.
 A.
 
 2
 Plaintiff Richard W. Goldstein is an attorney admitted to practice before the United States Patent and Trademark Office (the "PTO"). He alleges that certain PTO officials — specifically James E. Rogan, the Under Secretary of Commerce for Intellectual Property and Director of the PTO; Harry Moatz, the Director of the PTO's Office of Enrollment and Discipline ("OED"); OED staff attorney Lawrence Anderson, and PTO General Counsel James Toupin — contravened his constitutional rights in the course of a disciplinary investigation conducted by the OED.[2]
 
 
 3
 Pursuant to PTO regulations, the OED Director is responsible for investigating allegations of misconduct by members of the patent bar. 37 C.F.R. §§ 10.2(b)(2), 10.131(a). When the Director conducts a disciplinary investigation, practitioners are required to report and reveal to him any unprivileged knowledge they possess of PTO disciplinary rule violations. Id. §§ 10.24(a), 10.131(b). If, after investigation, the Director believes that a practitioner has violated a disciplinary rule, he is obliged to convene the PTO's Committee on Discipline (the "Committee"). Id. § 10.132(a). The Committee is a body of at least three PTO staff attorneys appointed by the Commissioner for Patents. Id. § 10.4(a). The Committee decides whether there is probable cause to believe that a disciplinary rule has been violated. Id. § 10.4(b). If the Committee makes a finding of probable cause, the Director initiates formal disciplinary proceedings by filing a complaint against the attorney and referring the matter to an administrative law judge (an "ALJ"). Id. § 10.132(b), (c). Such disciplinary proceedings may result in the issuance of a reprimand, or they can lead to the suspension or expulsion of a lawyer from the patent bar. Id. § 10.132(b).
 
 
 4
 Between December 6, 2000, and June 28, 2002, the OED received complaints regarding Goldstein from at least four of his clients. The complaints, apparently forwarded to the PTO by South Carolina's Department of Consumer Affairs, pertained to Goldstein's representation of patent-seekers in his work with an invention promotion company. OED Director Moatz assigned staff attorney Anderson to investigate the complaints against Goldstein.
 
 
 5
 In the course of his investigation, Anderson sought information from Goldstein through the use of the PTO's Requirements for Information ("RFIs"). The first RFI served on Goldstein, dated December 5, 2000, required information pertaining to Goldstein's representation of "client C00-95" and contained sixty-four discovery requests, including multiple subparts. The RFI required Goldstein to submit written responses to the OED, together with supporting documentation, within thirty days. Anderson's RFI transmittal letter recited Goldstein's duty to report and reveal knowledge or evidence pursuant to 37 C.F.R. § 10.131(b), and it warned Goldstein that "[f]ailure to respond and answer the questions can be construed as failure to cooperate, and can be submitted to the Committee on Discipline for appropriate action." Anderson also referred Goldstein to 37 C.F.R. § 10.23(c)(16), which provides that willfully refusing to reveal or report knowledge of a disciplinary rule violation itself constitutes a disciplinary rule violation. Goldstein submitted his responses to the first RFI on December 19, 2000.
 
 
 6
 On March 15, 2001, Anderson served Goldstein with a second RFI, this time seeking information concerning Goldstein's representation of "client C00-117." This RFI contained approximately forty-eight inquiries, to which responses and supporting materials were due within thirty days.
 
 
 7
 On March 28, 2001, Anderson forwarded Goldstein another RFI concerning "client C00-95," containing forty-three requests with similar requirements. Anderson's transmittal letter indicated that the questions were based on Goldstein's previous responses of December 19, 2000, and also on newly discovered information. When Goldstein requested that Anderson identify the newly discovered information, however, Anderson indicated that he only meant Goldstein's answers to the first RFI. Out of concern for his client's confidences, Goldstein also sought from Anderson the identity of the person who had complained to the South Carolina authorities. Anderson replied that Goldstein was not then permitted to engage in discovery. Goldstein responded to this RFI on May 15, 2001.
 
 
 8
 On June 5, 2001, Goldstein wrote to Anderson, advising him that, as there was no indication that "client C00-117" intended to waive the attorney-client privilege, he could not ethically provide responses to Anderson's inquiries pertaining to that client. Anderson responded by reiterating the requests for information made in the second RFI, to which Goldstein reasserted the attorney-client privilege. On July 11, 2001, Goldstein responded to the requests to the extent that he could do so without violating the privilege. The PTO subsequently obtained a waiver of attorney-client privilege from "client C00-117" and instructed Goldstein to respond to the second RFI's remaining requests. Goldstein did so on August 16, 2001.
 
 
 9
 On November 20, 2001, Anderson served Goldstein yet another RFI concerning "client C00-95." The next day, Anderson mailed Goldstein an RFI regarding a third client, "client C2002-12." Five days later, Anderson forwarded Goldstein an RFI regarding a fourth client, "client C2002-13." Together, these final three RFIs required responses to approximately 152 requests, to be submitted to the OED, along with supporting documentation, within thirty-six days.
 
 
 10
 On December 20, 2001, Goldstein filed with the PTO a "Petition to Invoke the Supervisory Authority of the Commissioner," challenging the PTO's use of RFIs in its attorney disciplinary investigations and requesting that "the Commissioner" (presumably the Commissioner for Patents) supervise the OED Director with respect to their issuance. On April 12, 2002, PTO General Counsel Toupin responded to Goldstein's Petition, denying relief and asserting that the RFIs were neither excessive nor an abuse of discretion. Toupin's letter also advised Goldstein that the April 12, 2002, letter was not a final decision from which Goldstein could appeal or otherwise seek review, and it instructed Goldstein to respond to the outstanding requests within thirty days. On June 28, 2002, Goldstein filed his responses to the three outstanding RFIs, making general objections to the RFI investigative process and asserting other objections to specific questions. At the time this appeal was filed, the OED had not initiated any disciplinary charges against Goldstein, nor had it informed him that its investigation had been closed.
 
 
 11
 In the midst of this process, in August 2001, "client C2002-13" contacted patent examiner Purol, inquiring why Purol had rejected his patent application.[3] Purol informed the client that he would reject the client's application no matter how many times it was filed, apparently because similar products had already been patented. Purol then advised the client that "something didn't sound right" with the company that had retained Goldstein to file the client's patent application, in that six prior patents should have been discovered in a patent search.
 
 B.
 
 12
 On November 26, 2002, Goldstein filed his Complaint in this matter, initiating suit against Rogan, Moatz, Anderson, Toupin, and Purol in their individual capacities. In Counts I and II, Goldstein brought Bivens actions for damages and declaratory relief, respectively, for the violation of his constitutional rights to free speech and due process through issuance of the RFIs.[4] In Count III, Goldstein sought damages under state tort law for Purol's alleged interference with his business relationship with "client C2002-13."[5]
 
 
 13
 On January 31, 2003, the defendants filed a motion, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, seeking to dismiss the Complaint for failure to state a claim upon which relief can be granted. They contended that (1) Rogan was not personally involved in any violation of Goldstein's constitutional rights; (2) Moatz, Toupin, and Anderson are absolutely immune from Goldstein's claims or, in the alternative, are protected by qualified immunity; (3) Count II fails to state a declaratory judgment claim against the defendants in their individual capacities; and (4) the Federal Tort Claims Act ("FTCA") provides Goldstein's exclusive remedy for Purol's allegedly tortious act.
 
 
 14
 In support of the motion to dismiss Count III, the United States Attorney certified, pursuant to 28 U.S.C. § 2679(d)(1), that Purol was acting within the scope of his employment at all relevant times, and thereby the United States was substituted as the party defendant in that Count.[6] Goldstein then challenged the certification and sought discovery regarding the scope of Purol's employment.
 
 
 15
 At the conclusion of a motions hearing conducted on February 21, 2003, the district court ruled from the bench in favor of the defendants. In its ruling, the court dismissed all three counts of the Complaint, granting, inter alia, the 12(b)(6) motion as to defendants Moatz, Anderson, and Toupin on the basis of absolute immunity, and denying Goldstein's challenge to the scope of employment certification and his request for discovery.[7] Goldstein has appealed from these rulings, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.[8]
 
 II.
 
 16
 We review de novo a district court's dismissal of a complaint for failure to state a claim. Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir.1993). Accordingly, we review de novo the district court's determination that the defendants are protected by absolute immunity. We also review de novo a district court's scope of employment determination, Gutierrez de Martinez v. DEA, 111 F.3d 1148, 1152 n. 3 (4th Cir.1997), and we review for abuse of discretion the denial of a request for discovery on a scope of employment issue. Id. at 1155.
 
 III.
 A.
 
 17
 We consider first whether the Defendants[9] are absolutely immune from Goldstein's Bivens action for damages.[10] As the Supreme Court has explained, the defense of absolute immunity bars suit against "officials whose special functions or constitutional status requires complete protection from suit...." Harlow v. Fitzgerald, 457 U.S. 800, 807, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (citing Butz v. Economou, 438 U.S. 478, 508-512, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (according absolute immunity to executive officers engaged in adjudicative functions); Stump v. Sparkman, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978) (according absolute immunity to judges for judicial functions); Eastland v. U.S. Servicemen's Fund, 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975) (according absolute immunity to legislators for legislative functions)). As the Court has recognized, the purpose of absolute immunity "is not to protect an erring official, but to insulate the decisionmaking process from the harassment of prospective litigation." Westfall v. Erwin, 484 U.S. 292, 295, 108 S.Ct. 580, 98 L.Ed.2d 619 (1988). In this regard, courts are obliged to apply absolute immunity sparingly, because "[t]he presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." Burns v. Reed, 500 U.S. 478, 486-87, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991).
 
 
 18
 Qualified immunity will bar a civil action against a government official unless the plaintiff has alleged the deprivation of a constitutional right that was clearly established at the time of the alleged violation. Conn v. Gabbert, 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999). Absolute immunity, as its name suggests, differs from qualified immunity in that absolute immunity acts as a complete bar to damages claims of any sort, constitutional or otherwise. See Austin v. Borel, 830 F.2d 1356, 1358 (5th Cir.1987).[11]
 
 
 19
 The Supreme Court has made it clear that government officials seeking the protection of absolute rather than qualified immunity "bear the burden of showing that public policy requires an exemption of that scope." Butz, 438 U.S. at 506, 98 S.Ct. 2894. The Defendants seek to meet this burden by asserting that our decision in Ostrzenski v. Seigel, 177 F.3d 245 (4th Cir.1999), controls the disposition of this appeal. Goldstein responds that Ostrzenski is distinguishable and that its holding should neither be expanded nor extended.
 
 
 20
 In order to recognize the grounds on which Ostrzenski may be distinguishable, we must first understand the parameters of absolute immunity established in Supreme Court precedent. First, in Butz, the Supreme Court addressed the types of immunity typically accorded administrative agency officials. Butz, 438 U.S. at 478, 98 S.Ct. 2894. There, the plaintiff had alleged that certain officials of the Department of Agriculture, involved in investigating, prosecuting, and adjudicating enforcement proceedings against him, had violated his due process and free speech rights. Id. at 480, 98 S.Ct. 2894. The Court accorded the Butz defendants absolute immunity, observing that "agency officials performing certain functions analogous to those of a prosecutor should be able to claim absolute immunity with respect to such acts." Id. at 515, 98 S.Ct. 2894. In assessing the absolute immunity issue presented here, we must therefore decide whether the Defendants, who are neither judges, legislators, nor prosecutors, performed functions analogous to those for which prosecutors would be absolutely immune.
 
 1.
 
 21
 a.
 
 
 22
 In analyzing the functions for which prosecutors enjoy absolute immunity, the controlling line of authority begins with the Supreme Court's 1976 decision in Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). In Imbler, the Court explained that, when prosecutors perform advocative functions that are "intimately associated with the judicial phase of the criminal process," they are absolutely immune from civil suit. Id. at 430, 96 S.Ct. 984. Imbler had initiated suit against a prosecutor, alleging that the prosecutor had conspired with other government officials to allow a witness to provide false testimony and to have a sketch of the suspect altered to resemble Imbler more closely. Id. at 415-16, 96 S.Ct. 984. In addition, Imbler claimed that the prosecutor was personally liable because he was responsible for a fingerprint expert's suppression of evidence. Id. at 416, 96 S.Ct. 984.
 
 
 23
 In addressing the immunity issue, the Court first explained that, at common law, prosecutors had been protected by absolute immunity. The Court then determined that the policy concerns recognized under common law supported an award of absolute immunity in that proceeding. Id. at 424, 96 S.Ct. 984. Those public policy considerations included the need for prosecutors to focus on their duties rather than on defending civil suits, and the corollary need for prosecutors to exercise independent discretion without fear of retaliation. Id. at 423, 96 S.Ct. 984. The Court explained that qualified immunity provides insufficient protection for prosecutors because they must often act quickly and with little information. Id. at 424-35, 96 S.Ct. 984. Although recognizing that absolute immunity "does leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty," Justice Powell observed that "the alternative of qualifying a prosecutor's immunity would disserve the broader public interest." Id. at 427, 96 S.Ct. 984.
 
 
 24
 The Imbler Court declined to specify the specific prosecutorial functions that give rise to the protection of absolute immunity, but it approved of the Ninth Circuit's "functional" analysis — "focus[ing] upon the functional nature of the activities rather than respondent's status [as a government official]." Id. at 430, 96 S.Ct. 984 (citing Imbler v. Pachtman, 500 F.2d 1301, 1302 (9th Cir.1974), aff'd, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)). The Ninth Circuit had recognized that "the reasons for absolute immunity apply with full force" to those prosecutorial functions that are "intimately associated with the judicial phase of the criminal process." Id. (citing Imbler, 500 F.2d at 1302). Because the factual scenario presented in Imbler required the Supreme Court to consider only the type of immunity to be afforded a prosecutor involved in initiating and prosecuting a criminal case, the Court had "no occasion to consider whether like or similar reasons require immunity for those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate." Id. at 430-31, 96 S.Ct. 984.
 
 
 25
 In 1991, the Supreme Court had occasion, in its Burns decision, to address the issue it had reserved in Imbler. See Burns, 500 U.S. 478, 111 S.Ct. 1934, 114 L.Ed.2d 547. Prior to Burns, the inferior federal courts generally had interpreted Imbler to stand for the proposition that prosecutors are not entitled to absolute immunity for their administrative or investigative activities. See id. at 483 n. 2, 111 S.Ct. 1934. It remained to be determined, however, at what point in the process a prosecutor ceases to function as an administrator or an investigator and begins to act as an advocate. In Burns, the Court confirmed the distinction between investigative and advocative activities in deciding whether absolute immunity should be accorded a prosecutor who provides legal advice to police officers concerning probable-cause issues or to a prosecutor's participation in a probable-cause hearing. Id. at 487-96, 111 S.Ct. 1934. The Court held that, under Imbler, the prosecutor enjoyed absolute immunity for his actions in the probable-cause hearing. Id. at 492, 111 S.Ct. 1934. Because "appearing at a probable-cause hearing is `intimately associated with the judicial phase of the criminal process,'" the Court found that the prosecutor was acting as an advocate. Id. at 492, 111 S.Ct. 1934 (quoting Imbler, 424 U.S. at 430, 96 S.Ct. 984) (internal citation omitted). The Court also ruled, however, that under the common law of immunity and the guidelines of Imbler, a prosecutor is not entitled to absolute immunity for providing legal advice to police officers. Id. at 492-96, 96 S.Ct. 984. The common law afforded no such immunity to prosecutors, the Court observed, and this function is not sufficiently tied to the judicial process to warrant such protection. Id.
 
 
 26
 Although the Burns decision provided the lower courts with guidance on how the functional analysis should be applied, many prosecutorial functions were yet to be categorized. In 1993, the Court's decision in Buckley v. Fitzsimmons established an important principle. 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209. Buckley, the plaintiff in that proceeding, had been charged with murder. Id. at 261, 113 S.Ct. 2606. He initiated a § 1983 claim alleging, inter alia, that prosecutor Fitzsimmons had fabricated evidence during the murder investigation. Id. at 261-62, 113 S.Ct. 2606. Buckley claimed that, when three separate studies failed to connect him to a boot print at the crime scene, Fitzsimmons sought out an expert "who was allegedly well known for her willingness to fabricate unreliable expert testimony." Id. at 262, 113 S.Ct. 2606. The Court applied the Imbler decision's functional analysis to those circumstances and ruled that Fitzsimmons was not entitled to absolute immunity. His acts were investigative rather than advocative, the Court decided, and a prosecutor should not be accorded absolute immunity for actions for which a police officer would enjoy only qualified immunity. Id. at 273-74, 113 S.Ct. 2606. Rejecting Fitzsimmons's assertion that he was acting as an advocate while seeking a shoeprint expert witness, the Court, through Justice Stevens, observed that, "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." Id. at 274, 113 S.Ct. 2606 (emphasis added). A prosecutor, then, is not protected by absolute immunity for his activities prior to a probable cause determination, because he is not yet — and should not yet be — acting as an advocate. Id.
 
 
 27
 This proposition — that officials do not enjoy absolute immunity for acts committed prior to a probable cause determination ( i.e., during investigation) — flows logically from the Supreme Court's declarations that the purpose of absolute immunity is to protect the exercise of discretion by key government officials. See Westfall, 484 U.S. at 295, 108 S.Ct. 580 (explaining that the purpose of absolute immunity is "to insulate the decisionmaking process from the harassment of prospective litigation"); Imbler, 424 U.S. at 423, 96 S.Ct. 984 (noting that absolute immunity serves the public policy need for prosecutors to exercise unfettered discretion). The protection afforded by absolute immunity extends to activities "intimately associated with the judicial phase of the criminal process," Imbler, 424 U.S. at 430, 96 S.Ct. 984, because those activities, like judicial decisionmaking, involve the substantial exercise of discretion. Once a prosecutor possesses probable cause, he must decide whether to prosecute, which charges to initiate, what trial strategy to pursue, and a multitude of other important issues that require him to exercise discretion. In a pre-probable-cause investigation, on the other hand, a prosecutor exercises no more discretion than a police officer and thus should enjoy no more protection than qualified immunity. See Buckley, 509 U.S. at 273, 113 S.Ct. 2606 ("When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is `neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.'") (quoting Hampton v. City of Chicago, 484 F.2d 602, 608 (7th Cir.1973)). We therefore must determine whether, in this setting, the Defendants are akin to prosecutors possessing probable cause and exercising their discretion, or whether they are akin to investigators involved in pre-probable-cause activities.
 
 
 28
 b.
 
 
 29
 In the circumstances presented, Moatz, Anderson, and Toupin acted merely as investigators and are therefore not entitled to absolute immunity. Most significantly, there has been no probable cause assessment or determination, as required to initiate formal disciplinary charges against Goldstein. In fact, the Defendants do not make a probable cause determination — that task, under the applicable regulations, belongs to the Committee. 37 C.F.R. § 10.4(b) (providing that "[t]he Committee on Discipline shall meet at the request of the Director and after reviewing evidence presented by the Director shall, by majority vote, determine whether there is probable cause to bring charges under § 10.132 against a practitioner"). Indeed, the Director has not convened the Committee; therefore, the OED has not been afforded an opportunity to assess whether there is probable cause to believe that Goldstein has committed a disciplinary rule violation. Moatz, Anderson, and Toupin thus have not acted as advocates.
 
 
 30
 Not only is a formal probable cause determination lacking, but Moatz himself is not "of the opinion that [Goldstein] has violated a Disciplinary Rule" because, if he so believes, he is required by regulation to "call a meeting of the Committee on Discipline." Id. § 10.132(a). Because Moatz does not believe that Goldstein has violated a disciplinary rule, he could not, in pursuing his investigation through the RFIs, have been gathering information as an advocate. Accordingly, he was functioning as an investigator, seeking evidence regarding whether a disciplinary rule may have been violated.
 
 
 31
 Furthermore, the PTO's regulations require only that the Director convene the Committee — they do not contemplate him making a recommendation to the Committee on whether it should find probable cause against a lawyer. See id. (providing that, if he believes a disciplinary rule has been violated, "the Director shall ... call a meeting of the Committee on Discipline"); id. § 10.132(b) (providing that, if the Committee finds probable cause, "the Director shall institute a disciplinary proceeding"). Under the regulations, Director Moatz is not called upon to act as an advocate until after the Committee has made a finding of probable cause. He therefore did not exercise discretion such as would entitle to him to absolute immunity.
 
 
 32
 It is all the more apparent that staff attorney Anderson functioned simply as an investigator rather than as an advocate, because Anderson's belief (unlike Director Moatz's) about whether Goldstein violated a disciplinary rule has no regulatory significance. Indeed, PTO staff attorneys such as Anderson do not act as advocates under this regulatory scheme and do not decide whether charges should be brought; they simply gather information. Anderson's actions, therefore, were purely investigatory.
 
 
 33
 Toupin also performed no role as an advocate in the course of the disciplinary proceedings; his actions in responding to Goldstein's Petition of December 20, 2001, and in upholding the RFI process in his letter of April 12, 2002, are not analogous to the advocative activities performed by prosecutors. See Butz, 438 U.S. at 515, 98 S.Ct. 2894. In addition, although Toupin did not himself seek information from Goldstein, he asserted his authority over the investigative process by ratifying the OED's actions and requiring that Goldstein respond to the RFIs within a certain time frame. In these circumstances, Toupin acted in the role of supervisor over Moatz and the OED's investigation; he did not perform discretionary tasks so entwined with judicial proceedings that they require the protection of absolute immunity.
 
 
 34
 c.
 
 
 35
 Despite the Defendants' assertions to the contrary, our ruling today does not run counter to our decision in Ostrzenski.[12] There, a doctor who had been investigated by the Maryland Board of Physician Quality Assurance sued a peer reviewer who had investigated him at the Board's request. Ostrzenski, 177 F.3d at 247. We held the peer reviewer to be protected by absolute immunity. The peer review functions in Ostrzenski are readily distinguishable from those performed by the Defendants, however, in that the peer reviewer was obliged by regulation not only to investigate but also to make recommendations to the Board concerning the actions it should take. See Md.Code Ann., Health Occ. § 14-401(e)(1)(i),(e)(2) (1994 & Supp.1998). As Judge Wilkins carefully explained, the peer reviewer could enjoy absolute immunity only when performing a protected prosecutorial function, which in that instance was "reviewing the evidence to determine whether to recommend prosecution." Ostrzenski, 177 F.3d at 250. The function of recommending prosecution is protected by absolute immunity because it requires the exercise of discretion. And the doctrine of absolute immunity was designed to protect, among other things, the free exercise of discretion. See Imbler, 424 U.S. at 423, 96 S.Ct. 984. The Defendants here, unlike the peer reviewer in Ostrzenski, have neither the statutory nor regulatory authority to recommend disciplinary action; they merely investigate.[13] Although the peer reviewer enjoyed absolute immunity for the intertwined activities of making his recommendation to the Board and conducting the investigation to support his recommendation, we decline to expand or extend Ostrzenski to cover circumstances such as these, involving purely investigative activities without a concomitant recommendation.[14]
 
 2.
 
 36
 The importance of denying absolute immunity to the Defendants in this proceeding is underscored by the utter lack of procedural safeguards protecting Goldstein's rights and his clients' secrets. The Supreme Court has indicated that, in assessing whether absolute immunity applies in a particular situation, we should consider whether the system in question contains adequate procedural safeguards, such that private litigation is unnecessary to protect constitutional rights. See Butz, 438 U.S. at 512, 98 S.Ct. 2894. On this point, Goldstein maintains — and the Defendants agree — that Goldstein has no means of challenging the RFIs because he has not been formally charged with a disciplinary violation. Furthermore, Goldstein contends that he had no option but to answer the RFIs because failure to comply would itself constitute a violation of the disciplinary rules. We agree with Goldstein that the denial of any avenue for challenge, and the threats of charges for non-compliance, are indicative of a system lacking sufficient procedural safeguards.
 
 
 37
 In assessing the available safeguards protecting the recipient of an RFI, we are naturally inclined to turn to the regulation authorizing issuance of RFIs, found at 37 C.F.R. § 1.105. That regulation, titled "Requirements for information," provides that, "[i]n the course of examining or treating a matter in a pending or abandoned application ..., in a patent, or in a reexamination proceeding, the examiner or other Office employee may require the submission ... of such information as may be reasonably necessary to properly examine or treat the matter...." 37 C.F.R. § 1.105(a)(1). It plainly appears, therefore, that RFIs are to be used only to gather information on patent applications, not information concerning possible violations of attorney disciplinary rules.
 
 
 38
 At oral argument, however, the Defendants maintained for the first time that, in serving the RFIs on Goldstein, they did not intend to invoke the authority of § 1.105. There was "nothing talismanic" about the use of the term "RFI," the Defendants now assert; the submissions to Goldstein were labeled "RFIs" simply because that term is familiar to lawyers in the patent community. The Defendants make this contention to rebut Goldstein's allegation that the RFIs were used to circumvent the standard discovery procedures in place to protect an attorney under investigation.
 
 
 39
 The regulations governing disciplinary procedures provide for discovery only after the initiation of disciplinary proceedings, and then only under the supervision of an ALJ.[15] Clearly, the proper procedure for obtaining discovery from an attorney facing discipline — after formal charges have been initiated — contains adequate safeguards, in that the discovery process, pursuant to the applicable regulations, is then supervised by an ALJ and limited to a reasonable number of necessary and relevant requests. Id. § 10.152(a). In this instance, however, because the RFIs were issued prior to the initiation of a disciplinary charge, Goldstein enjoyed no such protection. In response, the Defendants now assert that they were not seeking "discovery" from Goldstein in the technical sense of the term, but that they were merely requesting information from him. We must reject these apparent after-thoughts. The Defendants'"mere requests" to Goldstein in the RFIs carried with them explicit threats of disciplinary charges for failure to comply. And the applicable regulations simply do not provide for such discovery prior to the initiation of formal disciplinary charges or absent ALJ supervision.
 
 
 40
 The Defendants concede that, as charges have not been filed, there is no vehicle by which Goldstein can challenge the RFIs as unduly burdensome or as protected by attorney-client privilege or attorney work-product privilege. According to the Defendants, Goldstein could assert such challenges before an ALJ if he were to refuse to comply and if the OED were to initiate disciplinary charges against him based on that refusal. The Defendants maintain that this speculative opportunity for review is sufficient to protect Goldstein's rights. As explained below, we are constrained to disagree.
 
 
 41
 An attorney should not be compelled to subject himself to disciplinary charges, and the adverse consequences that may flow therefrom, in order to protect his client's confidences or to challenge unduly burdensome discovery. Cf. Steffel v. Thompson, 415 U.S. 452, 459, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) (declaring that "it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights"); Hickory Fire Fighters Ass'n v. City of Hickory, 656 F.2d 917, 922 (4th Cir.1981). Under the OED's current system, nothing but good conscience would prevent an OED investigator from requiring responses to an unlimited and burdensome array of questions by noon tomorrow and bringing charges against an attorney who fails to comply. Unfortunately, the only available limitation in this system is a private lawsuit; therefore, it is all the more important that the Defendants not be accorded absolutely immunity. In light of the foregoing, we remand this proceeding to the district court, with leave to assess whether the Defendants are entitled to qualified immunity.[16]
 
 B.
 
 42
 We next turn to Goldstein's request for declaratory relief. In deciding whether a government official is immune from suit for specific relief, a court must first determine whether the suit is actually a suit against the sovereign; that is, "whether, by obtaining relief against the officer, relief will not, in effect, be obtained against the sovereign." Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 688, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). The Larson Court explained that, in such a situation, "the compulsion, which the court is asked to impose, may be compulsion against the sovereign, although nominally directed against the individual officer." Id. Of course, not all suits against government officials are suits against the sovereign. Id. at 689, 69 S.Ct. 1457. "If the officer purports to act as an individual and not as an official, a suit directed against that action is not a suit against the sovereign." Id. As the Supreme Court carefully explained:
 
 
 43
 where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden. His actions are ultra vires his authority and therefore may be made the object of specific relief.
 
 
 44
 Id. If a declaratory judgment proceeding actually constitutes a suit against the sovereign, it is barred absent a waiver of sovereign immunity. See id. at 688, 69 S.Ct. 1457. Because the district court has not separately addressed the application of immunity principles to Goldstein's request for declaratory relief, we must also remand Count II for a determination of whether the Defendants are subject to that form of relief.[17]
 
 C.
 
 45
 Finally, Goldstein challenges the United States Attorney's certification that Purol was acting within the scope of his employment when he committed the acts alleged in Count III. Goldstein further asserts that the court erred in denying him discovery on the scope of Purol's employment. We agree with the district court on this issue.
 
 
 46
 Contrary to Goldstein's assertions, he has no right to discovery on the certification issue. The assessment of whether discovery is appropriate on such an issue is within the sound discretion of the district court, and any discovery that is authorized should be narrowly circumscribed. Gutierrez de Martinez, 111 F.3d at 1154-55.[18] As we have explained, "the district court may allow (in its discretion) limited discovery or conduct an evidentiary hearing, but should not do so if the certification, the pleadings, the affidavits, and any supporting documentary evidence do not reveal an issue of material fact." Id. at 1155. Goldstein has failed to identify any issue of material fact that would prompt us to conclude that the court abused its discretion in denying his discovery request, and we have no reason to believe that Purol's duties were in any way different from those of the ordinary patent examiner.
 
 
 47
 Although Goldstein contests the district court's rejection of his challenge to the scope of employment certification, he does not assert that he has shown that Purol acted outside the scope of his employment. See id. at 1153 (explaining that certification "serves as prima facie evidence and shifts the burden to the plaintiff to prove, by a preponderance of the evidence, that the defendant federal employee was acting outside the scope of his employment"). To the contrary, Goldstein maintains that he cannot meet his burden without the benefit of discovery. Because the court did not abuse its discretion in denying Goldstein discovery on this issue, we reject Goldstein's challenge to the scope of employment certification.
 
 IV.
 
 48
 Pursuant to the foregoing, we affirm the district court on the scope of employment issue and on its dismissal of defendant Rogan; we vacate its ruling on absolute immunity as to defendants Moatz, Anderson, and Toupin; and we remand for such further proceedings as may be appropriate.
 
 
 49
 
 AFFIRMED IN PART, VACATED IN PART, AND REMANDED
 
 
 
 
 Notes:
 
 
 [1]
 See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (recognizing cause of action against federal officials for violation of constitutional rights).
 
 
 [2]
 For purposes of this appeal, we accept as true the allegations of Goldstein's ComplaintSee Spriggs v. Diamond Auto Glass, 165 F.3d 1015, 1016 n. 1 (4th Cir.1999).
 
 
 [3]
 The Goldstein client who spoke with Purol had previously provided Goldstein with a power of attorney. The PTO's previous communications concerning the client's patent application had been between Goldstein and the PTO
 
 
 [4]
 In his Complaint, Goldstein purports to assert separate claims (i.e., Count I and Count II) for damages and declaratory relief. Because Counts I and II allege virtually identical facts and each seeks relief underBivens, we view Counts I and II as seeking separate remedies for the same wrong rather than as asserting separate causes of action.
 
 
 [5]
 Construing Goldstein's Complaint in his favor,see Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 112, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979), he has sued defendants Rogan, Moatz, Anderson, and Toupin in Counts I and II, and he has sued only defendant Purol in Count III.
 
 
 [6]
 Pursuant to the Federal Tort Claims Act:
 Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.
 28 U.S.C. § 2679(d)(1). The various United States Attorneys have been delegated the authority to make such certifications. 28 C.F.R. § 15.3(a).
 
 
 [7]
 The court dismissed the claims made against defendant Rogan in Counts I and II because the allegations against him were devoid of personal involvement and failed to state a claim. The court went on to note that, even assuming otherwise, Rogan would be entitled to absolute immunity. On appeal, Goldstein does not challenge the court's ruling that he failed to allege sufficient personal involvement on Rogan's part. We therefore leave undisturbed the dismissal of Goldstein's claims against Rogan
 
 
 [8]
 Although the parties do not contend that we lack jurisdiction, we note that jurisdiction over this appeal does not lie in the Federal Circuit. Pursuant to 28 U.S.C. § 1295(a)(1), "The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction — (1) of an appeal from a final decision of a district court ... if the jurisdiction of that court was based, in whole or in part, on section 1338 of this title...." Section 1338(a) of Title 28 provides that "[t]he district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents...." In assessing § 1338, the Supreme Court has explained that:
 § 1338(a) jurisdiction ... extend[s] only to those cases in which a well-pleaded complaint establishes either that federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims.
 Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 808-09, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988).
 We agree with the parties that Goldstein's claims do not arise under federal patent law or depend substantially on the interpretation thereof. Goldstein's Bivens and tortious interference causes of action are created by the federal courts and by state common law, respectively, not by federal patent law. Furthermore, no issue of patent law is a necessary element of Goldstein's claims. His Bivens claim for damages and declaratory relief requires proof of two elements: (1) a violation of his constitutional rights, (2) by agents acting under color of federal law. See Bivens, 403 U.S. at 389, 91 S.Ct. 1999. And the elements of Goldstein's tortious interference claim are: (1) existence of a business relationship, (2) defendant's knowledge of the relationship, (3) intentional interference causing a termination of the relationship, and (4) resulting damage. See Chaves v. Johnson, 230 Va. 112, 120, 335 S.E.2d 97 (1985). None of these elements requires resolution of a substantial question of federal patent law.
 In sum, although the circumstances giving rise to Goldstein's complaint concern his ability to practice law before the PTO, his claims are neither created by federal patent law nor require us to resolve a substantial question of patent law. We therefore possess jurisdiction pursuant to 28 U.S.C. § 1291.
 
 
 [9]
 Our references to the "Defendants" in Subparts III.A and III.B of this opinion include only defendants Moatz, Anderson, and Toupin. Our use of the term "Defendants" excludes defendant Purol, who is discussed separately in Subpart III.C, and defendant Rogan, the claims against whom we have disposed of separatelySee supra note 7.
 
 
 [10]
 We address Goldstein's request for declaratory relief in Subpart III.B, as that remedy must be analyzed independently of Goldstein's request for damages. The district court failed to separately address Goldstein's request for declaratory judgment; rather, it discussed the quasi-judicial nature of the actions taken by Toupin, Moatz, and Rogan, and it then dismissed all three counts. Because, as explainedinfra, different doctrines apply, we address the request for damages and the request for declaratory relief separately.
 
 
 [11]
 We note that, because we are reviewing an award of absolute rather than qualified immunity, it is not necessary to determine whether Goldstein has alleged a constitutional violationSee Buckley v. Fitzsimmons, 509 U.S. 259, 261, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993) (assuming that plaintiff alleged constitutional violations under 42 U.S.C. § 1983 and proceeding with absolute immunity analysis); see also Megenity v. Stenger, 27 F.3d 1120, 1123 (6th Cir.1994) ("Analytically, the key difference between a qualified immunity analysis and an absolute immunity analysis begins with the first step. When an official is cloaked with absolute immunity, it is not necessary to determine whether the plaintiff has a clearly established legal right because, even if he does, no relief is forthcoming."); Kenyatta v. Moore, 744 F.2d 1179, 1184 (5th Cir.1984) (noting that absolute immunity differs from qualified immunity in that "[a]bsolute immunity may be determined solely on the basis of the official status of the defendant and whether he acted in the course of that duty. Qualified immunity cannot be decided without a complete determination of the nature of both the wrongful act [i.e., whether it constitutes a constitutional violation] and the law applicable at the time it was committed, in addition to those factors.").
 
 
 [12]
 The Defendants also rely on professional discipline decisions of other circuits for the propositions that determining an attorney's fitness to practice law and deciding whether to prosecute are inherently judicial functions. Although these propositions may have validity in the proper setting, they are of no help to the Defendants, who have not been sued for performing either of these functions, but rather have been sued for acts committed in theirinvestigation of Goldstein. Furthermore, as the Second Circuit has explained, heavy reliance on such authorities is misplaced because disciplinary procedures vary, and a careful analysis of the pertinent facts of each case is required. DiBlasio v. Novello, 344 F.3d 292, 299-300 n. 2 (2d Cir.2003) (holding New York health fraud investigator not entitled to absolute immunity).
 
 
 [13]
 The Defendants also maintain that their investigative activities should afford them absolute immunity because their investigation gathered evidence that would inform the Committee's decision on whether to initiate disciplinary action. This contention must also be rejected. As the Supreme Court has explained, "[a]lmost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute, but we have never indicated that absolute immunity is that expansive."Burns, 500 U.S. at 495, 111 S.Ct. 1934.
 
 
 [14]
 OurOstrzenski decision is also distinguishable for another apparent reason. Maryland law specifically provided that officials conducting physician reviews enjoyed absolute immunity for purely investigative activities:
 A person who acts without malice and is a member of the [State Board of Physician Quality Assurance] or a legally authorized agent of the Board, is not civilly liable for investigating, prosecuting, participating in a hearing under § 14-405 of the Health Occupations Article, or otherwise acting on an allegation of a ground for Board action made to the Board or the Faculty.
 Md.Code Ann., Cts. & Jud. Proc. § 5-715(b) (1994 & Supp.1998) (emphasis added). The law we must apply here, however, does not absolutely protect government actors performing purely investigative functions. See Pachaly v. City of Lynchburg, 897 F.2d 723, 727 (4th Cir.1990).
 
 
 [15]
 The applicable regulation with respect to discovery in disciplinary proceedings against patent attorneys provides:
 Discovery shall not be authorized except as follows:
 (a) After an answer is filed under § 10.136 and when a party establishes in a clear and convincing manner that discovery is necessary and relevant, the administrative law judge, under such conditions as he or she deems appropriate, may order an opposing party to:
 (1) Answer a reasonable number of written requests for admission or interrogatories;
 (2) Produce for inspection and copying a reasonable number of documents; and
 (3) Produce for inspection a reasonable number of things other than documents.
 
 
 [37]
 C.F.R. § 10.152(a)
 
 
 [16]
 The Defendants maintain that Goldstein conceded at the motions hearing that they are protected by qualified immunity, and that his suit cannot go forward. Our review of the hearing record reveals that Goldstein conceded only the undisputable point that the Defendants are officers to whom the doctrine of qualified immunity applies. He specifically refused to concede that he had failed to allege a constitutional violation such that the Defendants are actually immune. Although the district court expressed the view that Goldstein may have failed to allege enough, the qualified immunity issue was not fully litigated and decided by the court; therefore, remand is appropriate
 
 
 [17]
 On remand, the court may also consider whether Goldstein possesses standing to assert his claim for declaratory relief. Goldstein must show a realistic threat of future harm in order to bring suitSee City of Los Angeles v. Lyons, 461 U.S. 95, 104, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (concluding that plaintiff lacked standing to seek declaratory judgment that officers' use of chokeholds was illegal where plaintiff failed to demonstrate sufficiently real and immediate threat that police would again utilize chokehold against him). Although Goldstein has complied with the RFIs, the investigation into his activities remains open, and it is not clear whether he faces such a threat of future harm. The district court is in the best position to resolve this factual issue.
 
 
 [18]
 Discovery should be as narrowly circumscribed as possible because the immunity that flows from a scope of employment certification is, like other immunities, an absolute bar to suitGutierrez, 111 F.3d at 1154.
 
 
 DIANA GRIBBON MOTZ, Circuit Judge, dissenting:
 
 50
 With great respect, I dissent. Although purported constitutional violations provide the sole ground for federal jurisdiction here, Goldtein's complaint utterly fails to allege facts giving rise to any constitutional violation. It thus fails to state a claim on which relief can be granted. Accordingly, we should remand this case so that the district court can dismiss it pursuant to Fed.R.Civ.P. 12(b)(6).[1]
 
 
 51
 Even ascertaining the parameters of Goldstein's asserted constitutional claim presents a challenge. His 33-page, 113-paragraph, complaint barely mentions the purported constitutional violation and his factual allegations, although lengthy, do little to clarify his legal theory. The most that can be gleaned from them is that, as the majority puts it, Goldstein has "brought Bivens actions ... for the violation of his constitutional rights to free speech and due process through issuance of the RFIs." Ante at 210.
 
 
 52
 But the OED's "issuance of the RFIs" to Goldstein simply does not provide the basis for any cause of action against OED. In fact, almost half a century ago, the Supreme Court considered and expressly rejected a contention very similar to Goldstein's. See Hannah v. Larche, 363 U.S. 420, 424, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960).
 
 
 53
 In Hannah, the plaintiffs complained, inter alia, of the "315 written interrogatories" sent to them by a commission in the course of an investigation. The Court upheld the constitutionality of all of the commission's procedures, including its issuance of the assertedly burdensome and irrelevant interrogatories and its refusal to furnish the targets of the investigation with the names of the complainants and contents of the complaints. Id. at 424, 451, 80 S.Ct. 1502. The Court explained that the commission had engaged in "purely investigatory and fact-finding" activities, which might "subsequently be used as the basis for legislative or executive action," but which did not in themselves "affect an individual's legal rights." Id. at 441, 80 S.Ct. 1502. To impose in this context the constitutional procedures appropriate when "governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals" would, the Court concluded, "make a shambles of the investigation and stifle the agency in its gathering of facts." Id. at 442-44, 80 S.Ct. 1502.
 
 
 54
 So it is here. As my colleagues have emphasized, ante at 215-17, the OED, like the agency in Hannah, has engaged only in "purely investigative and fact-finding" activities. Id. at 441, 80 S.Ct. 1502. The OED has not disbarred Goldstein from the patent bar or even determined that there is probable cause that he violated a disciplinary rule. In short, the OED has not taken (and indeed could not take) any final action "affect[-ing]" Goldstein's "individual[] legal rights," id., and thus, necessarily, the OED could not have even arguably violated any of Goldstein's due process rights.[2]
 
 
 55
 Of course, as in Hannah, the facts found by the OED "may subsequently be used as the basis for ... executive action." Id. Conceivably, the OED investigation, like the investigation in Hannah, may subject Goldstein "to public opprobrium and scorn," loss of employment, or even "the possibility of criminal prosecutions." Id. at 443, 80 S.Ct. 1502. And Goldstein ultimately could be punished for failure to respond to the RFIs issued by OED investigators. But "even if such collateral consequences were to flow from" the investigation, these consequences do not give rise to a constitutional claim against OED because they "would not be the result of any affirmative determinations made by" OED. Id. The OED investigators cannot even make a determination about whether to sanction Goldstein if he should refuse to reply to an RFI. Goldstein can only be punished for failure to reply if (in proceedings from which the investigators are wholly insulated by regulation) the Director convenes the Committee on Discipline, that body makes a probable cause finding, the Director files a complaint, an administrative law judge rules against Goldstein as to the complaint, and that ruling is upheld on appeal.
 
 
 56
 Not only does Hannah itself provide a singularly compelling precedent here, in addition, courts, including the Supreme Court, have continued to apply the Hannah principle in related contexts. For example, "because an administrative investigation adjudicates no legal rights," they have summarily rejected a number of constitutional challenges to similar SEC investigative procedures. SEC v. Jerry T. O'Brien, Inc., 467 U.S. 735, 742, 104 S.Ct. 2720, 81 L.Ed.2d 615 (1984) (rejecting Fourth, Fifth, and Sixth Amendment challenges); RNR Enters., Inc. v. SEC, 122 F.3d 93, 98 (2d Cir.1997); Gold v. SEC, 48 F.3d 987, 991-92 (7th Cir.1995). This is so despite the fact that the SEC often engages in wide-ranging investigations (certainly broader than the OED investigation of Goldstein) "without any knowledge of which of the parties involved," among "thousands of purchasers," might "have violated the law." O'Brien, Inc., 467 U.S. at 749 & n. 21, 104 S.Ct. 2720.
 
 
 57
 Of even greater relevance here, courts have also applied these principles in rejecting challenges to attorney discipline and public corruption investigations. See, e.g., Anonymous Nos. 6 & 7 v. Baker, 360 U.S. 287, 291-96, 79 S.Ct. 1157, 3 L.Ed.2d 1234 (1959) (holding no due process right to refuse to answer questions before "purely investigatory and advisory" attorney disciplinary hearings); In re Bailey, 182 F.3d 860, 872 (Fed.Cir.1999)(rejecting an array of constitutional claims and finding even if Committee on Admission and Practice for the Court of Appeals for Veterans Claims did engage in "dilatory and abusive tactics," it violated no due process right of the complainant because the "court, not the Committee" ultimately makes "the determination whether [the complainant] would be subject to discipline"); Romero-Barcelo v. Acevedo-Vila, 275 F.Supp.2d 177, 202 (D.P.R.2003) (finding that "[a]ttorneys who will be accorded all the traditional judicial safeguards at a subsequent adjudicative proceeding ... should some type of adjudicative proceeding subsequently b[e] instituted, cannot successfully complain that they were not provided with the procedural due process at an investigatory hearing") (internal quotation marks and citations omitted); see also In re Logan, 70 N.J. 222, 358 A.2d 787, 789-92 (1976).
 
 
 58
 Indeed, this court has been especially observant of the Hannah principle. Thus, even when an administrative body could issue a "finding of reasonable cause," we have held that "due process considerations do not attach" to its investigatory proceedings. Georator Corp. v. EEOC, 592 F.2d 765, 768 (4th Cir.1979). We reasoned that even then an agency simply "utilize[s]" its "investigative powers" and its finding "carries no determinative consequences" without subsequent judicial enforcement. Id. Notably, we reached this conclusion notwithstanding recognition that the "determination of reasonable cause" was "final in itself," and might be admissible in a subsequent federal suit. Id. at 769. Surely, if "due process considerations do not attach" in such circumstances, they do not attach here given that the OED cannot even issue a probable cause determination.
 
 
 59
 For all of these reasons, I must respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 Of course, as the majority notes,ante at 212 n. 11, a court need not determine whether a plaintiff has alleged a constitutional violation prior to determining the defendant's entitlement to absolute immunity. However, when, as here, the immunity question is close and the lack of a constitutional violation obvious, resolving the immunity claim first seems to me a waste of judicial resources, serving only to prolong a plainly meritless case.
 
 
 [2]
 Goldstein's "free speech" claim is of even less substance. The factual allegations in his complaint totally foreclose his sole First Amendment argument. Goldsteinargues that OED "targeted" him for what he had "been saying" and that he was "singled out ... because of the types of clients he represents," conceivably a First Amendment retaliation/Fifth Amendment selective enforcement claim. But in his complaint Goldstein alleges that the OED generally issues RFIs in an abusive manner to members of the patent bar. E.g., J.A. 7 (referencing OED's "pattern and practice of forcing attorneys like the Plaintiff who are licensed to practice before the USPTO, to provide burdensome amounts of documents") (emphasis added); J.A. 8 (asserting "[d]efendants have routinely initiated such investigations without regard for their legitimacy or fairness, as a means to burden the Plaintiff and other patent practitioners.") (emphasis added); J.A. 35 ("Defendants have used RFIs as a harassment tool in fighting a `war of attrition' following a nearly identical pattern of abuse against numerous other licensed patent practitioners") (emphasis added). Thus, Goldstein affirmatively asserts in his complaint that OED treated him in the same manner that it treated other members of the patent bar, completely subverting his only possible First Amendment argument.