# United States Court of Appeals for the Federal Circuit

2006-1243

S. MICHAEL BENDER,

Plaintiff-Appellant,

v.

Jon W. Dudas, DIRECTOR, PATENT AND TRADEMARK OFFICE,

Defendant-Appellee.

S. Michael Bender, of St. Petersburg, Florida, argued for plaintiff-appellant. With him on the brief was Ross A. Nabatoff, Brand Law Group, of Washington, DC.

Sydney O. Johnson, Jr., Associate Solicitor, United States Patent and Trademark Office, of Arlington, Virginia, argued for defendant-appellee. With him on the brief were John M. Whealan, Solicitor, and Janet Gongola, Associate Solicitor.

Appealed from: United States District Court for the District of Columbia

Judge Reggie B. Walton

# United States Court of Appeals for the Federal Circuit

2006-1243

S. MICHAEL BENDER,

Plaintiff-Appellant,

v.

Jon W. Dudas, DIRECTOR, PATENT AND TRADEMARK OFFICE,

Defendant-Appellee.

_____

DECIDED:  June 21, 2007
_____

Before RADER, <u>Circuit Judge</u>, PLAGER, <u>Senior Circuit Judge</u>, and LINN, <u>Circuit Judge</u>.

LINN, <u>Circuit Judge</u>.

S. Michael Bender ("Bender") appeals from a final decision by the United States District Court for the District of Columbia that granted summary judgment upholding a disciplinary action taken by the director of the United States Patent and Trademark Office (the "PTO" or "agency") to exclude Bender from practicing before the PTO. <u>Bender v. Dudas</u>, No. 04-CV-1301 (D.D.C. Jan. 13, 2006) ("<u>SJ Order</u>").  Because the PTO's findings were supported by substantial evidence, and because the disciplinary action was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, we affirm.

## I. BACKGROUND

This case involves the PTO's continuing efforts to regulate the conduct of patent agents and attorneys registered to practice before it and to provide assurance to inventors of effective counsel in filing and prosecuting applications for patents in the United States. The background of this case reads like a novel but represents the true story of hopes dashed, fees wasted, and dreams lost by hundreds of individual inventors caught up in the world of self-interested promoters who promise the world and deliver very little.

In the area of patent law, as in most other areas of the law, sophisticated clients generally are able to determine the kinds of legal representation they need and where to find counsel with the skills, integrity, and character appropriate for the matter at hand. Individual inventors, however, are often unfamiliar with even the most basic principles of patent law, do not know where to turn for help, and are vulnerable to those who seek to take advantage of their inexperience. Commonly available sources of guidance often are of little help, either because they are too simplistic or too generalized to be of any particular assistance or because they are too complex to be readily understood. Even mainstream media sources frequently confuse and misunderstand basic intellectual property law precepts. How often do we read articles confusing the forms of protection applicable to an invention, to a symbol indicating origin, or to a work of authorship with expressions like, "copyrighted his invention," "trademarked his idea," or "patented her textbook"?

The PTO has recognized the need to regulate those who practice before it. To this end, the PTO has determined minimum levels of legal competence and has

rigorously administered testing of those who seek to become registered patent agents and attorneys. It has also established minimum standards of ethical conduct expected of registered practitioners and has promulgated rules implementing those standards and providing a mechanism for their enforcement.

For individual inventors, the PTO's listing of registered patent agents and attorneys is a basic resource and an assurance of legal competence and good moral character. But as sophisticated as the PTO is in regulating practitioners who appear before it and in providing information about registered practitioners on its website and in other publicly distributed materials, it frequently finds itself challenged by so-called "invention promoters" who exploit unsophisticated inventors, heap every invention with praise regardless of the merits or the real prospects of legal protection, and entice inventors into engagement agreements filled with hollow guarantees of patent protection and promises of royalty-bearing licenses that seldom yield anything of any significant value.

In seeking to protect the public from unscrupulous invention promoters, the PTO has aggressively sought to monitor and enforce its disciplinary rules against those registered practitioners who act in concert and participation with these promoters in the prosecution of patent applications before the PTO. This case is about one such practitioner who became complicit in the activities of an invention promoter involving over 1,000 unsuspecting inventors.

These unsuspecting inventors first sought help from American Inventors Corporation ("AIC"), an invention promoter. According to testimony and declarations of past employees and clients, AIC would solicit inventors to present their ideas, tell each

inventor that their idea was great, and then perform a patent search. After the search, AIC would conduct a sales presentation that provided the inventor with a positive evaluation of the invention and offered AIC's services in procuring a patent and promoting the invention to manufacturers and other interested parties. The inventor then signed a standard form contract in which he or she paid a flat fee or a combination of a flat fee and a percent of royalty income in exchange for AIC's promise to hire a patent attorney on the inventor's behalf, pay all legal fees associated with prosecuting a patent application, and conduct various marketing activities to promote the invention. AIC also guaranteed that it would refund 100% of the inventor's flat fee if a patent was not procured. The contract did not specify what type of patent would be obtained or in any way explain the differences in protection between a design patent and a utility patent. Indeed, according to past employees and clients, AIC's general policy and practice was to conceal those differences from the inventors.

After the contract was signed, AIC would forward the inventor's disclosure to a patent attorney. Initially, that patent attorney was Leon Gilden. Although a number of the inventors' disclosures indicated that they sought to protect the useful and functional features of the invention—as opposed to ornamentation—Gilden drafted design patent applications in every case. In addition, Gilden allegedly employed draftsmen to add decorative ornamentation or surface indicia to the drawings of the inventions even though such embellishment was not invented by the named inventor. Gilden would send the completed design patent application to AIC, which would get the inventor's signature, and the application would then be filed using Gilden's registration number. At no point did Gilden consult with the inventors regarding the filing of a design patent

application or the embellished drawings because, according to a former AIC employee, direct contact between the inventors and the attorney was emphatically discouraged by AIC.

The alleged purpose of this scheme was to make it easier to obtain a patent and to avoid a refund of the inventors' fee under AIC's money-back guarantee. Gilden's alleged involvement in the embellishment scheme prompted the PTO to initiate disciplinary action against him in the early 1990s. The PTO also sent each applicant a Request for Information ("RFI") asking the inventors whether they invented the patterns on the drawings, whether they intended to apply for a design patent over a utility patent, and whether they understood the difference between a design and a utility patent. Ultimately, Gilden entered into a settlement agreement with the PTO and received a five-month suspension.

In 1993, AIC contracted with Bender, a registered patent attorney, to continue the prosecution of over 1,000 design applications that had formerly been handled by Gilden (the "Gilden applications"). The contract provided Bender with up to $15,000 bi-weekly as compensation for both attorney's fees and prosecution costs. Bender sent each Gilden applicant an engagement letter that included, among other things, the RFI that Gilden had failed to provide to the client and a brief discussion of the differences between a design patent and a utility patent. The engagement letter to each applicant was essentially the same; it did not provide any advice or inquiries that directly related to the particular invention at issue, the type of patent best suited to protect the invention, or the consequences of pursuing a design patent or a utility patent in each particular inventor's case. Furthermore, other than instructing the inventors to respond to the

RFIs, Bender did not attempt to determine whether the Gilden applicants had intended to file design patent applications and whether that decision had been made on an informed basis. As the responses to the RFIs indicated, a number of the inventors either did not understand the difference between a design and utility patent or had wanted a utility patent at the time the application was filed. Bender nevertheless continued to prosecute the Gilden applications as design patent applications, taking steps only to have Gilden's improperly added embellishments removed.

In the late 1990s, the Office of Enrollment and Discipline at the PTO began investigating Bender after receiving information indicating that he had violated the PTO's Code of Professional Responsibility. During that investigation, the Office of Enrollment and Discipline sent Bender several RFIs posing questions about his actions and conduct. In August 1999, a meeting of the Committee on Discipline was held in which it was determined that there was probable cause to bring charges against Bender for violations of PTO regulations. An administrative Complaint and Notice dated June 20, 2000, set forth ten counts alleging violations of PTO rules governing attorney conduct.

The charges against Bender were tried before an administrative law judge from March 26 through March 29, 2001. In a thorough 48-page opinion, the administrative law judge found that Bender had violated numerous PTO rules on attorney conduct and that exclusion from practice was warranted. Bender sought review of that initial decision under 37 C.F.R. § 10.154. In an equally thorough opinion, the general counsel for the PTO issued a final decision that adopted some of the violations found in the initial decision and affirmed the sanction of exclusion. Specifically, the general counsel

found that Bender had neglected an entrusted legal matter in violation of 37 C.F.R. § 10.77(c); accepted employment where professional judgment may be affected in violation of 37 C.F.R. § 10.62(a) and accepted compensation from a person other than a client without a full disclosure to the client in violation of 37 C.F.R. § 10.68(a)(1); and engaged in conduct that was prejudicial to the administration of justice in violation of 37 C.F.R. § 10.23(b)(5). Bender requested reconsideration of the final decision under 37 C.F.R. § 10.156(c). Reconsideration was largely denied.

Bender then filed a petition in the U.S. District Court for the District of Columbia to challenge the PTO's final decision. 35 U.S.C. § 32; 37 C.F.R. § 10.157. Based on the administrative record, Bender and the government filed cross-motions for summary judgment. Bender alleged procedural and due process violations; lack of jurisdiction; improper application of statutes, precedent, and agency regulations; and lack of a factual basis for the administrative law judge's and general counsel's decisions. See SJ Order, slip op. at 5. The district court confirmed that there were no genuine issues of material fact with respect to those issues and—in a 50-page opinion—addressed each of Bender's arguments, finding them unpersuasive. See id., slip op. at 7–49. Accordingly, the district court denied Bender's motion for summary judgment and granted summary judgment to the government. Id., slip op. at 50.

Bender filed a timely appeal to this court. Following oral argument, we instructed the parties to submit supplemental briefing addressing the standard utilized by the PTO in determining the sanction of exclusion and the proper standard of review for reviewing that determination. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1). See

<u>Wyden v. Comm'r of Patents & Trademarks</u>, 807 F.2d 934, 937 (Fed. Cir. 1986) (en banc).

## II. DISCUSSION

The PTO has statutory authority to suspend or exclude "from further practice before the Patent and Trademark Office, any person, agent, or attorney shown to be incompetent or disreputable, or guilty of gross misconduct, or who does not comply with the regulations established under section 2(b)(2)(D) of this title." 35 U.S.C. § 32. Section 2(b)(2)(D) delegates to the PTO the authority to establish regulations governing the conduct of attorneys practicing before the PTO. <u>Id.</u> § 2(b)(2)(D). Pursuant to that statutory authority, the PTO has enacted disciplinary rules, <u>see</u> 37 C.F.R. § 10.20(b) (listing the various disciplinary rules), and has established procedures and standards for determining whether those rules have been violated and what sanction should be imposed, 37 C.F.R. §§ 10.130–10.170.

The disciplinary action taken by the PTO is subject to review by the U.S. District Court for the District of Columbia according to the provisions of the Administrative Procedure Act. <u>See</u> 5 U.S.C. §§ 702–706; 35 U.S.C. § 32. Under that Act, the agency's choice of sanction is held unlawful only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706; <u>see also</u> <u>Butz v. Glover Livestock Comm'n Co.</u>, 411 U.S. 182, 185–86 (1973) ("[W]here Congress has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy 'the relation of remedy to policy is peculiarly a matter of administrative competence.'" (citation omitted)). The underlying factual findings used to support such a sanction are reviewed for substantial evidence. <u>Lipman v. Dickinson</u>,

174 F.3d 1363, 1367 (Fed. Cir. 1999). We review the district court's decision on summary judgment without deference, reapplying on appeal the same standards applicable to the district court. Lacavera v. Dudas, 441 F.3d 1380, 1382 (Fed. Cir. 2006).

Bender argues that substantial evidence does not support the PTO's findings that he violated various disciplinary rules, that the PTO exceeded its authority and violated his constitutional rights, and that the PTO abused its discretion in determining that exclusion was an appropriate sanction. We disagree and address each of Bender's arguments in turn.

### A. Substantial Evidence

The agency found that Bender violated multiple regulations governing attorney conduct before the PTO.

### 1. Section 10.77(c)

First, the PTO found that Bender "neglect[ed] a legal matter entrusted to the practitioner" in violation of 37 C.F.R. § 10.77(c). As the Gilden applicants' responses to the PTO indicated, many of Bender's clients did not appreciate the substantive difference between a design patent and a utility patent at the time the application was filed. Some applicants indicated that they had wanted to file a utility patent application. Although Bender was aware of those responses, he continued to prosecute the Gilden applications as design patents. The brief discussion of the difference between design and utility patents provided by Bender's engagement letter was an entirely hollow and formalistic gesture because it did not provide any of the Gilden applicants with advice that directly related to the particular inventions at issue, the type of patent best suited to

protect these particular inventions and the inventor's interests therein, or the consequences of pursuing a design patent instead of a utility patent. This failure is even more glaring in view of AIC's money-back guarantee that a patent would issue without regard to the type of patent that would be procured. Because design applications had already been filed in each case, and because AIC's money-back guarantee motivated continued prosecution of those applications as design applications, the information provided by Bender's engagement letter was an inadequate response to the confusion demonstrated by his clients' earlier responses to the RFIs. Any reputable attorney would have appreciated that the wholesale filing of design applications under such circumstances and the unauthorized addition of design embellishments were driven in large measure if not entirely by AIC's money-back guarantee. Such an attorney would have identified that motivation to each inventor, explained that such a motivation was not necessarily in the inventor's best interests, educated that inventor on the steps needed either to fix the improperly embellished design applications or to file continuation utility applications, and otherwise advised that inventor on how best to proceed in his or her particular case. As the PTO correctly found, Bender's communications to the Gilden applicants at the outset of his representation fell far short of these minimum standards.

Bender also fell short in neglecting to notify some of his clients of final rejections in their applications until _after_ the three-month period for responding to those rejections had expired. Bender does not dispute this failure, but instead explains that he purposefully delayed action in those cases pending the resolution of an appeal in a "test

case" that directly related to the rejections.[1] While such an explanation might justify advising the client to seek an extension of time under 37 C.F.R. § 1.136 or a stay of proceedings pending resolution of the test case, it does not justify an absolute failure to notify the client at all that a final rejection had issued, let alone the response needed, until after the period for response expired. Although Bender argues that the delayed notification had no adverse impact on the applications, prompt notification of the final rejection accompanied with an explanation of the available options would have given Bender's clients the choice as to how best to proceed and would have avoided depriving them of the right to avoid paying late filing surcharges.[2]

Because substantial evidence supports the PTO's determination that Bender neglected to advise his clients on how best to protect their inventions and neglected to promptly inform his clients that final rejections were received in their applications, we see no basis to overturn the decision that Bender violated 37 C.F.R. § 10.77(c).

## 2. Sections 10.62(a) and 10.68(a)(1)

Second, the agency found that Bender's financial relationship with AIC created a conflict of interest. Specifically, the PTO concluded that Bender's compensation from AIC affected Bender's "professional judgment on behalf of the client" in violation of 37

---

[1] After assuming the Gilden applications, Bender filed continuation design applications on the applicants' behalf that amended the original applications by deleting the improperly added patterns from the drawings. In one of those applications, the Board of Patent Appeals and Interferences described the matter as an issue of first impression and concluded that such an amendment constituted "new matter" that did not benefit from the earlier filing date. See In re Daniels, 144 F.3d 1452, 1455 (Fed. Cir. 1998). Bender was counsel for that applicant on appeal to this court, and we ultimately reversed the Board's decision. Id. at 1457.

[2] At the time, AIC had declined to pay for such prosecution costs, and Bender informed the individual clients that they were responsible for any continued prosecution costs and fees.

C.F.R. § 10.62(a) and constituted compensation by one other than the client without "the consent of the practitioner's client after full disclosure" in violation of 37 C.F.R. § 10.68(a)(1). The PTO interpreted section 10.62(a) as requiring, at a minimum, that Bender disclose the extent of his relationship with AIC and explain how AIC's money-back guarantee to procure a patent and its alleged involvement in improperly adding non-invented patterns to the drawings of the Gilden applications could create divergent interests in the continued prosecution of those applications. The PTO also interpreted the "full disclosure" requirement of section 10.68(a)(1) as requiring disclosure of the amount that Bender was being paid by AIC. Because both regulations require "full disclosure"—an undefined term that is left to the agency to determine—we defer to these interpretations of the agency's own regulations because they are not "plainly erroneous or inconsistent with the regulation." Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945)). Because Bender fails to point to any indication in the record that he met the disclosure requirements of 37 C.F.R. §§ 10.62(a) and 10.68(a)(1) as interpreted by the agency, we again see no basis to overturn the PTO's determination that Bender violated those regulations.

### 3. Section 10.23(b)(5)

Finally, the agency found that Bender "[e]ngaged in conduct that is prejudicial to the administration of justice" in violation of 37 C.F.R. § 10.23(b)(5) by providing the PTO with evasive responses to RFIs. In the RFI dated September 18, 1999, Bender was asked to explain when AIC made the offer to Bender to assume prosecution of the Gilden applications and when Bender accepted that offer. Bender responded by

referring to another answer in which he stated only that he had represented the inventors since about 1993. The same RFI also asked Bender whether he had disclosed his financial relationship with AIC to certain clients and whether he had explained to both those clients and AIC that he represented the clients' interests and not AIC's interests. Bender's only response to that question was to object that such a request was argumentative, indefinite, and based on the false premise that he represented the interests of AIC. The PTO's questions were specific questions directed to Bender's relationship with AIC and his disclosure of that relationship to his clients. His failure to respond to those questions in any meaningful way hindered the PTO's investigation. We therefore conclude that substantial evidence demonstrates that Bender engaged in evasive conduct prejudicial to the PTO's investigation, and we see no basis to overturn the PTO's determination that Bender violated 37 C.F.R. § 10.23(b)(5).

B. The Propriety of the Agency's Regulations and Actions

1.

Bender argues that 35 U.S.C. §§ 2(b)(2)(D) and 32 only authorize the PTO to establish regulations governing the conduct of attorneys "before the Office" and that the regulations at 37 C.F.R. §§ 10.62, 10.68, and 10.77 exceed that authority because they relate to client communications that are not made "before the Office." The language of those statutes indicates that they are broadly directed to service, advice, and assistance in the prosecution or prospective prosecution of applications. See 35 U.S.C. § 2(b)(2)(D) (ensuring that attorneys "render to applicants or other persons valuable service, advice, and assistance in the presentation or prosecution of their applications

or other business before the Office"); id. § 32 (providing for the suspension or exclusion of any attorney that defrauds, deceives, misleads or threatens "any applicant or prospective applicant, or other person having immediate or prospective business before the Office"). The regulations in question are well within the scope of the enabling statutes. To the extent the phrase "before the Office" in sections 2 and 32 is ambiguous, we defer to the PTO's reasonable interpretation of that phrase as authorizing regulations that govern a patent attorney's communications with and disclosures to a client in connection with the prosecution of applications before the PTO. See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–845 (1984); Lacavera, 441 F.3d at 1383 ("Because the PTO is specifically charged with administering [35 U.S.C. § 2(b)(2)], we analyze a challenge to the statutory authority of its regulations under the Chevron framework.").

2.

Bender also argues that the Fourth Circuit's decision in Goldstein v. Moatz, 364 F.3d 205 (4th Cir. 2004), establishes that the PTO's use of RFIs in his disciplinary investigation lacked procedural safeguards and was therefore constitutionally defective. The constitutionality of such RFIs was not at issue in Goldstein. Rather, the issue in that case was whether employees of the PTO were entitled to absolute or qualified immunity when conducting a disciplinary investigation. Id. at 211. The Fourth Circuit held that the employees were entitled only to qualified immunity, a determination it supported by the fact that such an investigation lacked procedural safeguards to protect the investigated attorney's rights. See id. at 217–19. The Fourth Circuit's decision did not hold that the use of RFIs in a disciplinary investigation was unconstitutional.

As the Supreme Court has recognized, "when governmental action does not partake of an adjudication, as for example, when a general fact-finding investigation is being conducted, it is not necessary that the full panoply of judicial procedures be used." Hannah v. Larche, 363 U.S. 420, 442 (1960); see also id. at 444–49 (surveying legislative, executive, and judicial investigative agencies and noting that those that appear before such agencies are generally not accorded procedural safeguards). That is because such procedures would unduly stifle the agency in its gathering of facts. See id. at 443–44. Here, the PTO issued to Bender RFIs in the course of conducting a nonadjudicative, fact-finding investigation prior to the initiation of any adjudicative proceedings. 37 C.F.R. § 10.131. This type of RFI not only assists the agency in gathering facts, it also protects practitioners by providing them with an opportunity to explain any questionable conduct and present reasons why disciplinary proceedings are not warranted. We therefore reject Bender's arguments based on Goldstein that the PTO's use of RFIs in its disciplinary investigation violated his right to procedural due process. We have considered Bender's remaining constitutional arguments and find them unpersuasive.

## C. The Sanction of Exclusion

In deciding what sanction to impose, the PTO normally considers "(1) the public interest; (2) the seriousness of the violation of the Disciplinary Rule; (3) the deterrent effects deemed necessary; (4) the integrity of the legal profession; and (5) any extenuating circumstances." 37 C.F.R. § 10.154(b). Bender argues that exclusion was improper because such a "draconian" sanction was motivated by malice, was punishment oriented, and failed to account for extenuating circumstances.

The PTO properly initiated disciplinary action in this matter based on improper practices conducted in the course of Bender's representation of clients that had been originally represented by Gilden and referred by AIC. After the improprieties surrounding the affairs of AIC came to light, Gilden agreed to a five-month suspension from practice to avoid formal disciplinary proceedings. That sanction was the result of a settlement agreement in which Gilden admitted to violating various regulations. Bender, however, has maintained throughout these proceedings that he has done nothing wrong. Moreover, he has continued to demonstrate a complete lack of remorse despite the clear findings, supported by substantial evidence, that Bender neglected legal matters with which he was entrusted, failed to disclose the conflict created by his financial relationship with AIC, and engaged in conduct prejudicial to justice.

Bender's sanction was not punishment oriented or based on malice. To the contrary, the PTO carefully evaluated and applied the factors outlined by section 10.154(b), including the extenuating circumstances that Bender identified. Specifically, the PTO considered Bender's efforts in litigating the Daniels case, the sanctions imposed in similar circumstances, and Bender's age. The PTO also noted that Bender had violated multiple regulations, that his misconduct was aggravated by specific notice from the outset that the arrangement with AIC was not resulting in adequate consideration of the inventors' needs, and that Bender refused to recognize the impropriety of his conduct or to express any remorse for his actions. The PTO ultimately concluded that Bender's failure to recognize that his conduct was improper created a likelihood that he would continue to violate the same disciplinary rules again and that, as a result, exclusion was necessary. The district court agreed.

Although Bender may have only had the best intentions in mind in assuming prosecution of the Gilden applications, the best of intentions cannot absolve Bender's complicity with AIC in a scheme fraught with deception and adversely affecting a large number of unsuspecting inventors. As an experienced patent practitioner, Bender had to have appreciated that the wholesale practice of filing design applications with unauthorized design embellishments in hundreds of applications was not in the inventors' interests but instead was driven by AIC's money-back guarantee. He should have known that the kind of letter he sent to his newly acquired clients fell far short of the explanation needed to address the distressed circumstances in which his clients were placed by his new employer, AIC. His letter, even though well written and perhaps sufficient as an engagement letter of a client in the first instance, only perpetuated the harm done to the Gilden applicants by treating what had previously transpired as nothing out of the ordinary when the circumstances of this entire matter—and Bender's conflicting interests in particular—were quite extraordinary. Bender's failure to appreciate that fact supports the PTO's determination that any sanction less than exclusion would not provide the necessary deterrent effect. Because we cannot conclude that the sanction of exclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, we have no reason to disturb the PTO's sanction of exclusion from practice.

## III.  CONCLUSION

For all of the foregoing reasons, we affirm the district court's grant of summary judgment.

<u>AFFIRMED</u>